494 So.2d 1297 (1986)
Lewis BLOXOM, et al, Plaintiffs-Appellees,
v.
Lonnie BLOXOM, et al, Defendants-Appellants.
No. 18023-CA.
Court of Appeal of Louisiana, Second Circuit.
September 24, 1986.
Writ Granted December 5, 1986.
*1298 Francis M. Gowen, Jr., Shreveport, for defendants-appellants.
Lunn, Irion, Johnson, Salley & Carlisle by Charles W. Salley, Brian D. Smith, Shreveport, for plaintiffs-appellees.
Before JASPER E. JONES, FRED W. JONES, Jr. and LINDSAY, JJ.
LINDSAY, Judge.
This suit was filed by Mr. and Mrs. Lewis Bloxom against Lonnie Bloxom and his liability insurer, Allstate Insurance Company, for damages resulting from the negligence of Lonnie Bloxom and against Pontiac Division of General Motors Corporation (General Motors) for an alleged defect in Lonnie's 1980 Pontiac Firebird Transam. Prior to trial, plaintiffs settled with Lonnie Bloxom and Allstate Insurance Company and the trial court granted a summary judgment in favor of Lonnie Bloxom and Allstate Insurance Company, dismissing all claims filed against them by General Motors. *1299 Following a trial on the merits, the trial court rendered a judgment in favor of plaintiffs, finding that Lonnie Bloxom and General Motors were each fifty percent at fault in causing the plaintiff's damages. General Motors brought this appeal to challenge the trial court's finding that "the exhaust system, as manufactured, and particularly as it related to the catalytic converter, is unreasonably dangerous to normal use, and that plaintiff's damages were caused by reason of the defect." We reverse that portion of the trial court judgment which held General Motors fifty percent at fault in causing the accident, as we find that Lonnie Bloxom's automobile was not defective.
In June of 1982, Mr. and Mrs. Lewis Bloxom were to leave for a vacation and had arranged for their son, Lonnie Bloxom, to stay at their residence in Frierson, Louisiana while they were away. Lonnie drove his 1980 Pontiac Firebird Transam approximately twenty miles from Shreveport to Frierson at an average speed of sixty miles per hour in order to reach his parents' residence.
Lonnie Bloxom testified that he had no problems with his automobile and that it ran smoothly during the trip to his parents' residence.
Upon arrival, it appeared to Lonnie that it might rain. Since his automobile had its T-top removed, Lonnie decided to back his car into his parents' hay barn. Later, Lonnie's girlfriend discovered that the hay barn was on fire and warned others at the residence. A local volunteer fire department was contacted. However, the barn, calf stalls, hay and automobile were completely destroyed by the fire.
In order to determine the cause and origin of the fire, the captain of the volunteer fire department contacted the State Fire Marshall's Office to have an investigator come to the Bloxom residence. Daniel Snow, Jr., presently a fire investigator for INS Investigation Bureau, Inc., responded to the call. From his investigation he concluded that the fire originated under Lonnie's vehicle and that the probable cause of the fire was the catalytic converter. This determination was based upon several factors. First, the pattern of the fire indicated that it started under Lonnie's automobile. Additionally, it was determined that Lonnie did not smoke and therefore a discarded cigarette would not have been the cause. Likewise, spontaneous combustion of the hay was eliminated as a possibility because the amount of hay under the car was not sufficient to create the conditions necessary for spontaneous combustion. Last, an inspection of the electrical wiring found in the barn did not yield any evidence of a short or other problem which would cause a fire.
General Motors presented two witnesses at trial. The first was Alfredo Gonzales, district sales manager for General Motors. Mr. Gonzales inspected the car and the former barn site in early December, 1983; approximately a year and a half after the fire. The site had been bulldozed and cleaned and the car moved from its original location and exposed to the weather. Visual inspection of the car revealed no abnormality in the converter with the exception of one small surface dent. While at the Bloxom residence, Mr. Gonzales obtained a sample of hay for laboratory analysis.
The second witness presented by General Motors was Jack Zimmerman, senior staff analysis engineer for General Motors Corporation. It was his opinion that the fire could not have been caused by the exhaust system of the automobile.
The basis for Mr. Zimmerman's opinion is the difference between the minimum temperature required to ignite the hay obtained by Mr. Gonzales and the maximum temperature reached by a catalytic converter. Mr. Zimmerman's testimony outlining the temperatures reached by various components of the exhaust system is summarized by the chart below.

*1300
EXHAUST SYSTEM SKIN TEMPERATURE (° F)
 Exhaust
 Manifold Ezhaust Pipe Converter Muffler
Idle [430]
55 MPH 822 649 227 292
55 MPH & Soak 788 627 495 389
70 MPH 943 729 256[260] 325
70 MPH & Soak 883 695 556 451
90 MPH [330]
90 MPH & Soak [535]
Idle,
 2 plugs not firing 538 516 875 735
Idle & Soak,
 2 plugs not firing 534 507 860 709

Mr. Zimmerman explained that the term "soak," as used on the chart, indicated that the automobile had been driven at the indicated speed until a constant temperature was reached and then the engine was shut off in a wind free environment. The temperatures were obtained by attaching thermocouplers to the underside of the various components on a "Typical 1975 General Motors V8 Engine." The bracketed temperatures were obtained from a test on a single car identical to the car involved herein. During the three or four minute period constituting "soak," the skin temperature of the exhaust manifold and exhaust pipe would drop, while that of the converter and muffler would rise. The rise in temperature is due to the high mass and insulation of these components. Furthermore, the converter on a 1980 Pontiac Firebird is six and a half to seven inches from the ground and the exhaust manifold is twelve to fifteen inches from the ground.
While a converter may overheat due to poor maintenance of an automobile engine, Mr. Zimmerman felt that this did not occur as Lonnie Bloxom testified that the car was in good running condition. Also during Mr. Gonzales' inspection of the car, none of the signs of overheating were observed, such as swelling, splitting, enlarging and discoloration. These conditions will occur when a converter reaches a temperature of 1050 degrees.
As a comparison, Mr. Zimmerman conducted tests to determine the ignition point of the hay obtained by Alfredo Gonzales from the Bloxom farm. This test was conducted in accordance with the guidelines established by the Experimental Department of the United States Forest Service in California. In conducting this test, a simple barbecue charcoal ignitor is placed in contact with the hay, or other matter, at a set temperature until a "glow" type fire is observed. This test is conducted with a two mile per hour wind blowing on the hay. The test results indicated that a temperature of 1000 degrees resulted in an instantaneous glow type fire while a temperature of 620 degrees would not create a fire. Moreover, at 700 degrees the hay would require three minutes of constant contact before ignition and at 650 degrees it would require six minutes. In addition to these temperatures, Mr. Zimmerman testified that an additional 75 to 200 degrees would be necessary to create a flame.
An additional important consideration is the distance between the heat source and the flammable material. It was explained that radiant heat is governed by the "ingress square of radiation." In an example given by Mr. Zimmerman, he stated that an object with a temperature of 550 degrees, at a distance of one inch, would radiate a temperature of 250 degrees.
The temperatures given for the ignition point of hay was determined by a heat source in constant contact with the hay. *1301 The hay in the Bloxom barn ranged in depth from one inch to one foot; with Lonnie Bloxom stating that the hay was even with the bottom of his opened car door. Hence, it is possible that the hay was in constant contact with the converter, but it is doubtful that it was in contact with the exhaust manifold.
Mr. Zimmerman listed as possible causes cigarettes, spontaneous combustion and hay in contact with the manifold. However, Mr. Zimmerman had not inspected the site and therefore could only speculate as to possible causes, having no supporting evidence for any of them.
The trial judge found that the fire was, more probably than not, started by the heated catalytic converter or possibly some other component of the exhaust system coming in contact with the loose hay on the barn floor. Moreover, the trial court found that the exhaust system, as manufactured, and particularly as it related to the catalytic converter, is unreasonably dangerous to normal use. Additionally, plaintiff's damages were caused by reason of that defect. Thus, the court established liability on the part of General Motors. The court also found that Lonnie Bloxom was negligent in parking over hay and in failing to read his owner's manual. Hence, the trial judge established the fault of Lonnie Bloxom and General Motors at fifty percent each.

PRODUCTS LIABILITY LAW
To support a finding of fault in a products liability case, a plaintiff must prove four elements. Each of defendants assignments of error correspond to one of these elements. First, plaintiff must prove that the product was defective, i.e., unreasonably dangerous. The second element is that the manufacturer failed to provide an adequate warning of an inherent danger not within the knowledge of or obvious to ordinary users. The next element is proof that the product was in normal use. The final element to be proven is that the defect in the product caused the complained of harm. Weber v. Fidelity & Casualty Insurance Company, 259 La. 599, 250 So.2d 754 (1971); Halphen v. Johns-Manville Sales Corporation, 484 So.2d 110 (La. 1986).

CAUSE
First, we address the issue of causation, for unless there be proof of a causal relationship between the product (whether defective or not) and the damages complained of, there can be no recovery.
When there is evidence before the trier of fact which, upon his reasonable evaluation of credibility, furnishes a reasonable factual basis for the trial court finding, on review the appellate court should not disturb this factual finding in the absence of manifest error.
Canter v. Koehring Company, 283 So.2d 716, 724 (La.1973).
Causation may, of course, be proved by circumstantial evidence ... taken as whole, circumstantial evidence must exclude other reasonable hypothesis with a fair amount of certainty. This does not mean, however, that it must negate all other possible causes. Otherwise, the mere identification by the record of another possibility, although not shown to be causally active, would break the chain of causation.
Naquin v. Marquette Casualty Company, 244 La. 569, 153 So.2d 395, 397 (1963). The trial judge's finding that more probably than not the fire was started by the heated catalytic converter or some other portion of the exhaust system coming into contact with the loose hay in the barn floor is adequately supported by evidence presented at trial. The defense expert, Mr. Zimmerman, did not inspect the site of the fire and the only other witness presented by the defense did not inspect the site of the fire until approximately eighteen months after the fire occurred. The defense pointed out other possible causes, but presented no substantiating evidence that the other causes may have actually existed. Plaintiff's expert also mentioned the same other possible causes; electrical short, spontaneous combustion and a discarded cigarette. However, each of these possibilities was *1302 negated. Therefore, the finding of cause by the trial court was not clearly erroneous.

DEFECTIVE PRODUCTSTHOSE WHICH ARE UNREASONABLY DANGEROUS
In Halphen v. Johns-Manville Sales Corporation, supra, the Louisiana Supreme Court described several different theories of recovery under products liability law in the state of Louisiana. A plaintiff may proceed under one or more of these theories. This case falls within two theories; products unreasonably dangerous per se, or those which are unreasonably dangerous in design.[1]

UNREASONABLY DANGEROUS PER SE
In the instant case, the trial court found "without reviewing the evidence in detail," that the exhaust system in Lonnie Bloxom's automobile, "as manufactured, and particularly as it related to the catalytic converter, is unreasonably dangerous to normal use."
A defective product is one that is "unreasonably dangerous to normal use." Weber v. Fidelity & Casualty Insurance Company of New York, supra, 250 So.2d at p. 755. A product is unreasonably dangerous per se if "a reasonable person would conclude that the danger-in-fact, whether foreseeable or not, outweighs the utility of the product." Halphen, supra, at p. 114 "A warning or other feature actually incorporated in the product when it leaves the manufacturer's control, however, may reduce the danger-in-fact." Halphen, supra, at p. 114. Likewise, a product is unreasonably dangerous if it is "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchased it, with the ordinary knowledge common to the community as to its characteristics." DeBattista v. ArgonautSouthwest Insurance Company, 403 So.2d 26, 31 (La.1981).
The danger in fact, one that was foreseeable by General Motors as evidenced by warnings found in the owners manual,[2] is that under certain conditions the exhaust system may cause the ignition of materials with relatively low combustion temperatures. Although the danger in fact may be large in one instance due to the extreme harm which fire may cause, the chance of a fire is minute. See: Dalton v. Toyoto Motor Sales, Inc., 703 F.2d 137 (5th Cir.1983). Considering the evidence presented at trial, particularly the testimony of Mr. Zimmerman, we conclude that the automobile, absent unusual circumstances, would not cause a fire.
This danger must be weighed against the utility of the product. The importance of the automobile, including its exhaust system and catalytic converter, in today's society is undeniable. It is the major method of transportation, commercial and personal, in a highly mobile society. Without it, or an equally useful alternative, our society could not exist in its present form.
Because of the vast utility of the product (automobile) and the warnings given, the danger-in-fact (fire resulting from extreme circumstances) does not outweigh the utility of the product. Regardless of the quality of the warnings provided by General Motors, we conclude that the automobile in question is not a product which is dangerous per se and therefore, is not a defective product under this theory of product liability law.

PRODUCTS WHICH ARE DEFECTIVE IN DESIGN/FAILURE TO WARN
A product may be unreasonably dangerous because of its design for any one of *1303 three reasons: (1) a reasonable person would conclude that the danger in fact, whether foreseeable or not, outweighs the utility of the product.... (2) ... Alternative products are available that serve the same needs or desires with less risk of harm; or, (3) ... There was a feasible way to design the product with less harmful consequences.
Halphen, supra, at p. 115.
Additionally, a product is unreasonably dangerous in design
if the manufacturer fails to adequately warn about a danger related to the way the product is designed. A manufacturer is required to provide an adequate warning of any danger inherent in the normal use of its product which is not within the knowledge of or obvious to the ordinary user.
Halphen, supra, at pp. 114 through 115.
The evidence relative to alternative products or design was presented by General Motors and by cross examination of General Motors' witnesses. This evidence negated the possibility of alternative products or design. Hence, plaintiffs must demonstrate that the product is unreasonably dangerous because of a failure to warn or because its design is such that a reasonable person would conclude that the danger in fact, whether foreseeable or not, outweighs the utility of the product. "This is the same danger-utility test applied in determining whether a product is unreasonably dangerous per se." Halphen, supra, at p. 115.
Having already concluded that the product is not unreasonably dangerous per se, we must next consider the three criteria for determining whether the product is unreasonably dangerous in design because of a failure to warn: (1) whether there is a danger which is not within the knowledge of or obvious to the user; (2) whether there is an adequate warning; and (3) whether the product was in normal use at the time of the accident.
Lonnie Bloxom's testimony indicates that, while he knew a muffler got hot, he did not think that the exhaust system of a car would start a fire. It is our determination the trial judge's conclusion that the danger of fire posed by an automobile would not be within the knowledge of or obvious to the ordinary user is not manifestly erroneous or clearly wrong.
A remaining element is whether General Motors provided an adequate warning. Two separate questions must be addressed under this issue; whether the warning was adequately worded and whether the warning was adequately placed.
Absolute liability upon a manufacturer whose product is useful, traditional, but which might become dangerous in some circumstances must be distinguished from the obligation here involved. There may be many tools or other products which become dangerous for normal use in certain conditions. But when the danger is known to the manufacturer and cannot justifiably be expected to be within the knowledge of users generally, the manufacturer must take reasonable steps to warn the user.
Chappuis v. Sears Roebuck and Company, 358 So.2d 926, 930 (La.1978).
A manufacturer of a product must give an adequate warning of any danger inherent in any product made by him or in its use which he knows or should have known, and which the user of the product would not ordinarily discover. The warning should be such that if followed, it would make the product safe for users. To comply with this duty, the manufacturer must appropriately label the product giving due consideration to the likelihood of accidents and the seriousness of the consequences from failure to label it to warn of any dangers that are inherent in it and its use or that may arise from improper handling or use of the product.
Andries v. General Motors Corporation, Delco, 444 So.2d 1180 (La.1983); Williams v. Airport Appliance and Floor Covering, Inc., 445 So.2d 764 (La.App. 2d Cir.1984); Winterrowd v. Travelers Indem. Co., 462 So.2d 639, 643 (La.1985).

*1304 The warning must be given in such a manner that it can reasonably be brought to the attention of the user, such as placing it on the container in which the product comes, placing it on the product itself, or where appropriate, providing an instruction or operation manual.
Quattlebaum v. Hy-Reach Equipment Inc., 453 So.2d 578, 586 (La.App. 1st Cir. 1984).
General Motors pointed out two warnings given in the owner's manual provided with each car. Lonnie Bloxom admitted that he did not read his owner's manual except when looking for an answer to a specific problem. The first warning is found on page 2-6 and states: "NOTICE: Do not drive through, idle or park your car over combustible materials, such as grass or leaves. They could touch the hot exhaust system and ignite." The second warning is found on page 5-2 and states: "To help prevent damage: ... 2. Do not drive through, idle or park your car over combustible materials, such as grass or leaves. They could touch the hot exhaust system and ignite."
The trial judge failed to make a specific finding in his opinion as to the adequacy of the warnings. However, he did find that Lonnie Bloxom was negligent in not reading the warnings.
The warnings are adequately worded to prevent a fire, if followed, and were the kinds of warnings which could be adequately covered by inclusion in the owner's manual. However, whether these warnings were so overly broad as to be ineffective, or whether they were improperly placed in the owner's manual, thus "hidden," from the operator, we are not required to decide since we find that the automobile was not in "normal use" and a manufacturer is only required to warn of dangers inherent in normal use.
"Normal use includes intended use and foreseeable use." Williams v. Airport Appliance and Floor Covering, 445 So.2d 764, 770 (La.App. 2d Cir.1984). "Normal use is a matter of foreseeable use and may include something broader than operation exactly in accordance with the manufacturers instructions." Pawlak v. Brown, 430 So.2d 1346, 1350 (La.App. 3d Cir.1983). (As discussed in Crawford, Torts, Developments in the Law 1984 through 1985, 46 La.L.Rev. 717, 720 (1986), the defense of misuse should be equated with contributory negligence and distinguished from a misuse which is an abnormal use.)
The use that Lonnie made of his automobile was a misuse; as stated by the trial judge, "a manifestly imprudent act on his part, a mistake...." Lonnie used the car as transportation from his home to that of his parents and parked it in the hay barn. While parking over grass in the yard may be contrary to instructions in the owner's manual and a foreseeable use, parking over six inches of hay is not. This case is an example of an extreme; an automobile parked in a hay barn, the floor of which was covered with suffucient loose hay to be even with the bottom of an automobile door when opened. There has been no showing that an automobile would cause a fire if parked over similar combustible materials in the manner they are usually encountered. Practical experience dictates that fire will not result, except in possibly extreme examples; as witnessed by thousands of cars parked daily in yards, grassy areas beside filled parking lots, and on the sides of roads near the sites of outdoor recreational areas such as fishing, camping or hunting sites. Thus, the danger presented herein is not one inherent in the "normal use" of an automobile and therefore the automobile is not unreasonably dangerous in design or due to a failure to warn.
For the reasons assigned, we find that the automobile driven by Lonnie Bloxom was not a defective product and therefore the judgment of the trial court against General Motors is reversed and set aside.
All costs of this appeal are assessed to plaintiffs.
REVERSED.
NOTES
[1] Under the remaining theory, a product is unreasonably dangerous in construction or composition if at the time it leaves the control of its manufacturer it contains an unintended abnormality or condition which makes the product more dangerous than it was designed to be.
[2] Twice, within the owner's manual provided with the automobile, General Motors warns: "Do not drive through, idle or park your car over combustible materials, such as grass or leaves. They could touch the hot exhaust system and ignite."