512 So.2d 839 (1987)
Lewis BLOXOM, et ux.
v.
Lonnie BLOXOM, et al.
No. 86-C-2108.
Supreme Court of Louisiana.
September 9, 1987.
*840 Francis Gowen, Jr., Shreveport, for applicant.
*841 Charles Salley, Brian Smith, Lunn, Irion, Johnson, Salley & Carlisle, Shreveport, for respondent.
DENNIS, Justice.
In this products liability case the catalytic converter-exhaust system of a 1980 Pontiac Trans Am Firebird parked in a barn ignited hay under the vehicle causing a fire and the destruction of plaintiffs' barn and other property. We are called upon to decide whether the car was in "normal use", whether the owner's manual gave "adequate warning" of the catalytic converter-exhaust system's incendiary propensity, and whether there was a causal connection between any deficiency in the warnings and the plaintiffs' damages. After a bench trial the district court found that the fire in fact had been caused by the car's converter-exhaust system and awarded the plaintiffs damages. The court of appeal reversed, holding that the vehicle was not in normal use when it ignited the hay over which it was parked. We affirm. "Normal use" of a product encompasses all reasonably foreseeable uses and misuses of the product. Whether a particular warning was "adequate" depends on all relevant considerations including the severity of the danger, the likelihood of successful communication of the warning to foreseeable consumers, the intensity and form of the warning, and the cost of improving the strength or mode of the warning. Although the plaintiffs proved that the car was in "normal use" and that the manufacturer failed to give an "adequate warning", plaintiffs' case failed because the manufacturer rebutted the presumption of a causal connection between the lack of an adequate warning and the damages by showing that an adequate warning in the owner's manual would have been futile because the owner never read the manual before parking the car over hay.

Facts
On June 24, 1982, Lonnie Bloxom parked his 1980 Trans Am Firebird in his parents' hay barn on their dairy farm in Frierson, Louisiana. Lonnie, who was 22 years old and had completed the 9th grade in formal education, worked for his parents on the farm. Lonnie had just driven his car from his home in Keithville at a maximum speed of 60 mph for approximately 20 minutes. The t-top on the car had been removed and rain was threatening, so Lonnie decided to move the car into the barn rather than put the t-top back into place. When Lonnie got out of the car, he noticed that the hay reached the bottom of the door on the driver's side. Hay bales were stored on the sides of the barn and hay was scattered over the dirt floor in varying depths. Lonnie's girlfriend, who was visiting, noticed some time later that the barn was on fire. The fire department was called, but the barn, the hay stored in the barn, attached calf pens, and the car were destroyed.
An investigator from the State Fire Marshall's Office, Daniel Snow, was sent out on June 25, to determine the cause of the fire. Snow ruled out arson and determined that the fire was caused by the car's catalytic converter or some other part of the exhaust system.
Lonnie's parents, Mr. and Mrs. Lewis Bloxom, the owners of the barn, hay and calf pens, filed suit on December 22, 1982 against their son; his insurer, Allstate Insurance Company; and Pontiac, a division of General Motors Corporation (GM). The Bloxoms' asked for damages caused by the negligent actions of Lonnie Bloxom and by the unreasonably dangerous condition of the Pontiac Firebird's catalytic converter or some other part of the car. A third party demand was filed against Lonnie Bloxom and his insurer by GM which alleged that the damage was caused by the negligence of Lonnie Bloxom and prayed for full indemnity or contribution of a virile share of any judgment rendered against GM.
Lonnie and Allstate settled with the Bloxoms' before trial for the policy limit of $5,000.00. The claims against Lonnie and Allstate by the Bloxoms' were then dismissed by the court. A motion for summary judgment on the third party demand against GM was filed by Lonnie and Allstate and granted by the trial court on April 25, 1983.
*842 At the trial, Mr. Snow testified that he had systematically ruled out other possible causes and that the most probable cause of the fire was the catalytic converter or some other part of the hot exhaust system. Gonzales, a district sales manager for GM, testified that he was sent to inspect the site of the fire one and one-half years after the incident. Gonzales, by observing the exterior of the catalytic converter on the burned out car, determined that the converter was not malfunctioning or defective. He also took a sample of the hay from the scene for later analysis. Zimmerman, a senior staff analyst for GM, was called as defendant's expert witness. Zimmerman reviewed test research conducted by GM on catalytic converters and other components of the exhaust system. He testified that, in his opinion, the catalytic converter did not get hot enough to ignite hay and therefore could not have caused the fire. Zimmerman postulated other possible causes for the fire, but also admitted that parts of the exhaust system could have caused the fire if they had come in contact with combustible material. The catalytic converter and the tailpipe on the Firebird were six and one-half inches from the ground, with the exhaust manifold being located somewhat higher. Both Gonzales and Zimmerman testified that GM placed a notice in the owner's manual warning owners about the dangers of a hot exhaust system, even though the danger of the hot system was well known and had existed since 1895. Zimmerman also testified that in 1976 and 1977 California required that warnings be placed in the car's sun visor while the state investigated the possible role of the catalytic converter in the increase of forest fires, but the practice was discontinued when California repealed the visor placement requirement. In Zimmerman's opinion, other warning or safety devices to alert the driver to overheated exhaust systems were either not feasible or did not work.
Lonnie testified that he was aware that exhaust systems get hot, but he did not know that the catalytic converter or other parts of the system could get hot enough to cause a fire. He also testified that he had not read the owner's manual and only referred to owner's manuals when something went wrong with the product.
After the trial on the merits, the trial court found that it was more probable than not that: (1) the fire was started by the catalytic converter or some other part of the exhaust system coming in contact with the hay, (2) the exhaust system was unreasonably dangerous to normal use, (3) the plaintiffs' damages were caused by the reason of that defect, and (4) Lonnie Bloxom was negligent in parking the car over hay and in failing to read the owner's manual. Therefore, GM and Lonnie were each found to be responsible for 50% of the fault and consequent damages. Damages were established at $18,900.00, less 50% attributable to Lonnie Bloxom's fault, plus witness fees totaling $750.00.
GM appealed. The court of appeal reversed. Bloxom v. Bloxom, 494 So.2d 1297 (La.App. 2d Cir.1986). The appellate court agreed with the trial court that the catalytic converter or some other part of the exhaust system had caused the fire, but did not find that the car was unreasonably dangerous, holding: (1) the car was not unreasonably dangerous per se because the utility of the car far outweighed the risk, especially with the warning contained in the owner's manual, (2) the car was not defective in design because: (a) the danger in fact did not outweigh the utility of the product, and (b) alternative designs or products were not feasible, (3) the car was not unreasonably dangerous because of a failure to warn adequately because the manufacturer is only required to warn of dangers inherent in normal use and the parking of the car over deep hay was not normal or foreseeable use, but rather a misuse. Because the court of appeal decided that the vehicle was not in normal use, it was not necessary that the court consider whether the warnings were adequate or whether any deficiency therein caused plaintiffs' damages.
We granted certiorari to review the court of appeal's decision. 497 So.2d 1006. After considering the briefs and arguments of parties we determine that the court of appeal reached correct results in deciding *843 that the Firebird was not unreasonably dangerous per se or unreasonably dangerous in design. Consequently, our written discussion will consider only whether the Firebird was in normal use, whether the manufacturer gave an adequate warning, and whether there was a causal connection between the failure to give an adequate warning and the damages.
The trial court found that the exhaust system in Lonnie Bloxom's car as manufactured, and particularly as it related to the catalytic converter, was unreasonably dangerous to normal use. However, we are unable to give this finding the usual deference attributed to the decisions of triers of fact at the trial level. The trial court's reasons do not articulate the theory or the evidentiary facts upon which its conclusion is based. Nor can we infer from the trial court's reasons and the record the theory under which the trial court found the product to be unreasonably dangerous to normal use. Although we may accord deference to a decision of less than ideal clarity if the trial court's path may reasonably be discerned, such as when its findings, reasons and exercise of discretion are necessarily and clearly implied by the record, we will not supply a finding from the evidence or a reasoned basis for the trial court's decision that it has not found or that is not implied. Cf. Save Ourselves v. La. Environ. Cont. Com., 452 So.2d 1152 (La.1984); Giallanza v. LPSC, 412 So.2d 1369 (La. 1982); Baton Rouge Water Works v. Louisiana Public Service Com'n., 342 So.2d 609 (La.1977); cf. Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281, 95 S.Ct. 438, 42 L.Ed.2d 477 (1974); 3 K. Davis, Administrative Law Treatise § 14:29 (1980) at 130.

Normal Use
In order to recover from a manufacturer, the plaintiff must prove, among other essentials, that his damage resulted from a condition of the product that made it unreasonably dangerous to normal use. Halphen v. Johns-Manville Sales Corp., 484 So.2d 110 (La.1986); Hunt v. City Stores, 387 So.2d 585 (La.1980); Chappuis v. Sears, Roebuck & Co., 358 So.2d 926 (La.1978); Weber v. Fidelity & Casualty Ins. Co. of N.Y., 259 La. 599, 250 So.2d 754 (1971). "Normal use" is a term of art that includes all intended uses, as well as all foreseeable uses and misuses of the product. Rey v. Cuccia, 298 So.2d 840 (La. 1974); Branch v. Chevron Oil Co., Inc., 681 F.2d 426 (5th Cir.1982); LeBouef v. Goodyear Tire & Rubber Co., 623 F.2d 985 (5th Cir.1980).
A manufacturer is required to provide an adequate warning of any danger inherent in the normal use of its product which is not within the knowledge of or obvious to the ordinary user. Halphen, supra, at 115. In the context of the manufacturer's duty to warn of the dangers in the use of a product, the manufacturer is obligated to anticipate the environment in which the product will be used and to give notice of the potential risks arising from foreseeable use in the foreseeable environment. See Conder v. Hull Lift Truck, Inc., 405 N.E.2d 538 (Ind.Ct.App.1980). Although a manufacturer markets a product for an intended use, in considering various instructions and warnings, a manufacturer may not simply close his eyes to hazards associated with foreseeable misuse of the product. When product misuse and its attendant risks are reasonably foreseeable, the manufacturer is in the best position to avoid product related injuries by giving an adequate warning. Id. at 546. See also Sales, The Duty to Warn and Instruct for Safe Use In Strict Tort Liability, 13 St. Mary's L.J. 521, 533-38 (1981).
Applying these precepts to the facts here, we conclude that the Firebird was being put to a foreseeable use or misuse at the time of the conflagration. Certainly GM should have expected that its automobile would be used in rural environments near livestock and haybarns by farmers and dairyworkers. The car also was designed and marketed with an intended and recognized appeal to youthful drivers, a class whose high jinks might well include parking in barns for less prudent reasons than sheltering an expensive motor vehicle. Furthermore, from our review of the record it appears that the barn was open on *844 three sides, to some extent resembling a carport designed for the protection of automobiles. The manufacturer must also concede that it was foreseeable that the automobile would be driven, idled and parked over dead grass, leaves and other combustible material. Otherwise, the company would not have twice placed a safety instruction concerning this use or misuse in its owner's manual. That such uses were to be anticipated is borne out by the court of appeal's observation that "thousands of cars [are] parked daily in yards, grassy areas beside filled parking lots, and on the sides of roads near the sites of outdoor recreational areas such as fishing, camping or hunting sites." 494 So.2d at 1304. See also, Dalton v. Toyota Motor Sales, Inc., 703 F.2d 137 (5th Cir.1983) (grassy highway neutral ground ignited by Toyota converter). Moreover, we do not think that such reasonably foreseeable uses or misuses, if indeed they are misuses, abruptly become unforeseeable when the grass or hay reaches six inches in height. Given the lack of any reference to the height of grass in the owner's manual and the general ignorance of the hot converter-exhaust danger on the part of the driving public, we conclude that driving, idling or parking over six inch grass or hay is equally as foreseeable as motoring on shorter herbage.

Adequacy of Warning
Whether a particular warning was adequate is a question for the trier of fact. Stapleton v. Kawasaki Heavy Industries, Ltd., 608 F.2d 571, 573 (5th Cir. 1979); Brownlee v. Louisville Varnish Co., 641 F.2d 397, 400 (5th Cir.1981); Dougherty v. Hooker Chem. Corp., 540 F.2d 174, 179 (3d Cir.1976); LeBouef v. Goodyear Tire & Rubber Co., 451 F.Supp. 253, 257 (W.D.La.1978); Berry v. Coleman Systems Co., 23 Wash.App. 622, 596 P.2d 1365, 1369 (1979). The determination of whether a warning is adequate depends upon a balancing of considerations including, among other factors, the severity of the danger, Marshall v. Beno Truck Equipment, Inc., 481 So.2d 1022,1032, (La. App. 1st Cir.1985) writ den., 482 So.2d 620 (1986); the likelihood that the warning will catch the attention of those who will foreseeably use the product and convey the nature of the danger to them, Andries v. General Motors, 444 So.2d 1180, 1183 (La. 1983); Bituminous Casualty v. Black & Decker, 518 S.W.2d 868, 872-73 (Tex.Civ. App.Ct.1974); Spruill v. Boyle-Midway, Inc., 308 F.2d 79, 87 (4th Cir.1962); Wolfe v. Ford Motor Co., 6 Mass.App. 346, 376 N.E.2d 143, 147 (1978); Seley v. G.D. Searle, Inc., 67 Ohio St.2d 192, 423 N.E.2d 831, 837 (1981); the intensity and form of the warning, Shell Oil v. Gutierrez, 119 Ariz. 426, 581 P.2d 271, 280-81 (App.Ct. 1978); Broussard v. Continental Oil Co., 433 So.2d 354 (La.App. 3rd Cir.) writ den., 440 So.2d 726 (1983); and the cost of improving the strength or mode of the warning. Dougherty v. Hooker Chem Corp., 540 F.2d 174, 179 (3rd Cir.1976); Broussard, supra at 358. See also cases touching on several of these factors: Chappuis, supra; Walker v. Maybelline, 477 So.2d 1136 (La.App. 1st Cir.) writ den., 481 So.2d 1333 (La.1986); Quattlebaum v. Hy-Reach Equipment, Inc., 453 So.2d 578 (La.App. 1st Cir.) writ den., 458 So.2d 474 (1984). See Sales, Duty to Warn and Instruct For Use In Strict Tort Liability 13 St. Mary's L.J., 521, 551-56 (1981); Restatement of Torts 2d § 402A, comment K.
In the present case neither the trial court nor the court of appeal reached the question of whether the warnings were adequate. We must decide the issue as a trier of fact from the record established by the evidence adduced at trial. Consequently, it is important to distinguish our discussion in this regard from statements of law, because it is possible that another reasonable trier of fact could reach a different conclusion, just as it is possible that we might reach a different result as a trier of fact in a catalytic converter-warning case presenting a dissimilar trial record.
The manufacturer's expert, an engineer employed full time by the company, testified that the severity of danger created by the risk of a fire caused by the Firebird's catalytic converter was not great. He testified that if the automobile's engine were *845 functioning properly, as Lonnie Bloxom's was, it was highly unlikely that the converter would generate enough heat to ignite hay or similar combustibles. He acknowledged that the operator's manual contained two warnings stating: "Do not drive through, idle, or park your car over combustible materials, such as grass or leaves. They could touch the hot exhaust system and ignite." However, he said that these warnings originally were included in the manual when a California law requiring warnings on sun visors was passed in response to reports that catalytic converters had caused forest fires. He testified that the law was later repealed and the sun visor warnings were discontinued; however, the company retained the manual warnings as a precaution against whatever risk might be caused by the converter. The plaintiffs did not call an expert witness on the subject of the characteristics and propensities of the catalytic converter-exhaust system.
Based on the record in this case, we conclude that the possibility of fire caused by driving, idling or parking the Firebird over combustible materials was not so great, when balanced with other pertinent factors, as to require a warning on the sun visor or elsewhere on the product itself. However, based upon the trial court's finding as to the cause of the fire and the testimony by the defendant's expert, we find that, although the possibility of such a fire is small, the potential consequences are quite serious, and that a warning commensurate with this danger should at least be set forth in the operator's manual.
Our examination of the operator's manual convinces us that it does not present warnings of sufficient clarity and intensity to adequately communicate the nature of the danger and the means of avoidance to those who will foreseeably use the automobile. The owner's manual consists of a booklet containing 106 pages divided into multitudinous sections of fine print. The manual's cover indicates that it contains "important operating safety and maintenance instructions." However, the safety instructions are not separated or designated as such in the manual. The sections containing the warnings at issue are reproduced as follows:

*846 STARTING AND OPERATING 2-5
Air Cleaner
Your car receives its power from a mixture of gasoline and air. The air enters the engine through the air cleaner. A dirty air cleaner element lessens engine performance and can waste fuel. So, its important to replace the air cleaner element (filter) at required intervals. (See the Maintenance Schedule folder.)
Air Conditioner
If your car has an optional air conditioner, use the "Economy" ("Vent" or "Heater") positions whenever possible. The air conditioner compressor is not on in these positions and the reduced engine load can improve fuel economy.
Engine Maintenance
An engine that is properly maintained will provide better fuel economy than one that is not. One misfiring spark plug will cut fuel economy quite a bit, and will make a difference in the amount of pollution emitted from your car.
Excess Weight
Fuel economy is related to the work the engine must do. The heavier the load, the more fuel it takes to run your car. Keep weight to a minimum by taking out any luggage or cargo when it is not needed.
Tire Inflation
Underinflation not only causes needless wear of the tires, but can also waste fuel. It's a good idea to check tire pressures often and, for the best fuel economy, keep your tires inflated to the highest pressures shown on the Tire Placard on the left door of your car.
Wheel Alignment
Improper toe alignment will cause the tires to roll at an angle, which will result in faster tire wear. It takes power to overcome this improper alignment which, in turn, wastes fuel.
STEERING COLUMN CONTROLS
ANTI-THEFT STEERING COLUMN LOCK
The anti-theft lock (ignition) on the right side of the steering column has five positions:
 Accessory - You can use some electrical accessories when the engine is not running. To engage this position, push in the square-head key and turn the top of the key toward you.
 Lock - Normal parking position. It locks the ignition and prevents normal use of the steering wheel and shift controls. The ignition key cannot be turned to "Lock" and removed until the shift lever is moved to "P" (Park) on automatic transmission models ("Reverse" on manual transmission models).
*847 
 Off - You can turn off the engine without locking the steering wheel and shift controls.
 Run - Normal operating position.
 Start - Cranks the engine.
If you have trouble turning the key to unlock the ignition, first be sure the key is pushed in all the way. Then, try to turn the steering wheel as hard as you can in the direction the wheels are turned. At the same time, turn the ignition key with as much effort as you can apply with your hand. Do not try to use a tool of any kind to apply more force on the lock knob, as this could break the knob.

NOTICE: Do not drive through, idle, or park your car over combustible materials, such as grass or leaves. They could touch the hot exhaust system and ignite.
PARKING
When leaving your car unattended:
 Firmly apply the parking brake. Do not use the transmission as a substitute for the parking brake.

*848 SERVICE AND MAINTENANCE 5 1
CAUTION: As with any machine, take care when making any check, doing any maintenance, or making any repair, to avoid being injured. Note that some of the materials in this vehicle may be hazardous if used, serviced, or handled improperly. Improper or incomplete service could also lead to the car itself not working properly which may result in personal injury, or damage to the car or its equipment. If you have any question about carrying out some service, have the service done by a skilled mechanic.
REPLACEMENT FASTENERS
During car maintenance, any fasteners used to replace older ones must have the same measurements and strength as those removed, whether metric or customary. (The numbers on the heads of metric bolts and on the surfaces of metric nuts show their strength. Customary bolts use radial lines to show this, while most customary nuts do not have strength markings.) Fasteners taken from the car should be saved for re-use in the same spot when possible. Where a fastener cannot be used again, take care to choose a replacement that matches the old one. For information and help, see your Pontiac dealer.
CAUTION: This car has some parts dimensioned in the metric system as well as in the customary system. Some fasteners are metric and are very close in dimension to well-known customary fasteners in the inch system. Mismatched or incorrect fasteners can result in damage to the car or possibly personal injury.
MAINTENANCE SCHEDULE
For owner convenience, a separate folder has been provided with your car which contains a complete maintenance schedule. It also briefly describes the safety, emission control, lubrication, and general service that your car requires.
The Maintenance Schedule folder is supplemented by this section of the Owner's Manual, as well as a Warranty Information folder also furnished with your car. Read all three publications for a full understanding of your car's maintenance needs.
To obtain a replacement Maintenance Schedule folder, see the order form in the back of this manual.
CATALYTIC CONVERTER
The catalytic converter is an emission control device added to the exhaust system to reduce exhaust gas pollutants. The converter contains a ceramic material coated with noble metal catalysts. To prevent contamination of the catalysts, unleaded gasoline must be used. Unleaded gasoline also reduces combustion chamber deposits and exhaust system corrosion.
The catalytic converter requires the use of unleaded gasoline. Use of leaded gasoline will cause the converter to lose its effectiveness for emission control.

*849 SERVICE AND MAINTENANCE 5-2
To help prevent damage:
1. Keep your engine properly maintained. Engine malfunctions involving the electrical, carburetion, or ignition systems may result in unusually high converter and exhaust system temperatures. Do not keep driving your car if you detect engine misfire, noticeable loss of performance, or other unusual operating conditions. Instead, have it serviced promptly. A properly maintained engine will help avoid malfunctions that could damage the converter. It will also help provide good emission control and gasoline economy. See the Maintenance Schedule folder for information on inspecting and maintaining the engine, exhaust system, and other components.
2. Do not drive through, idle, or park your car over combustible materials, such as grass or leaves. They could touch the hot exhaust system and ignite.
3. Do not push or tow this car to start it. This could damage the converter.
Disregarding this information could damage the catalytic converter, the vehicle, or nearby property.
C-4 (COMPUTER CONTROLLED CATALYTIC CONVERTER) SYSTEM
Your car may have a special emission control system, called the "C-4 (Computer Controlled Catalytic Converter) System." All new cars purchased in California have this system. Some cars purchased elsewhere may have this system if the car has a 3.8 Liter V-6 engine. (To find out if your car has this system, turn the ignition key to "Run" but do not start the engine. If a "Check Engine" light on the instrument panel comes on, your car does have the C-4 System.)
The C-4 System monitors the exhaust stream with an oxygen sensor. Based on sensor signals, the electronic control module adjusts the carburetor air-fuel ratio as needed.
An oxygen sensor maintenance reminder is included in the instrument panel on models without a 5.0 Liter (Engine Code H) V-8 engine. The word "EMISSIONS" will appear in a window in the speedometer face at the intervals outlined in Section C of the Maintenance Schedule folder. The "EMISSIONS" indicator serves as a reminder that the oxygen sensor must be replaced with a new sensor. Such replacement is necessary in order to maintain the correct operation of the emission control system. The indicator must be reset as part of this service.
A "CHECK ENGINE" light on the instrument panel will come on during engine starting to let you know the bulb is working. (The light will stay on a short time after the engine starts.) If the light comes on while driving, service to the C-4 System may be required. Contact your Pontiac dealer as soon as possible for an inspection of the system.
Continued driving without having the C-4 System serviced could eventually cause damage to the emission control system.
*850 The safety instruction on page 847 is labeled "notice" and is included in a section entitled "STEERING COLUMN CONTROLS" and subtitled "Anti-theft Steering Column Lock". The safety instruction appears at the end of the section which is otherwise devoted to instruction on operation of the ignition switch and steering column lock. Therefore, a reader could easily overlook the "notice" or fail to construe it as a warning of a serious danger related to a hot catalytic converter.
Although the safety instruction on page 849 pertains to the exhaust system as well as the catalytic converter, it is placed in the midst of detailed instructions on operation of the catalytic converter. In fact, it follows a long section describing how malfunction of the engine or other parts may cause unusually high converter and exhaust system temperature. Thus, this section as a whole could easily lead the reader to believe that a car with a properly operating engine presents no risk of fire caused by a hot converter-exhaust system.
The safety instructions fail as adequate warnings because they are easily confused with operating or maintenance instructions. They do not make clear whether the danger exists with respect to properly operating engines. They are not separated, labeled or prominently displayed as warnings in a way commensurate to their importance to a user's safety. More important, the message they contain does not communicate with clarity that the hazard warned of is a danger to the user's life and limb, not just to the vehicle, and the warning lacks the directness and intensity commensurate with such a danger.

Causal Relationship
An essential element of the plaintiff's cause of action for failure to adequately warn of a product's danger is that there be some reasonable connection between the omission of the manufacturer and the damage which the plaintiff has suffered. Halphen, supra; Hebert v. Brazzel, 403 So.2d 1242, 1244 (La.1981); Weber, supra; see, generally, Prosser & Keeton on Torts § 41; Twerski, Seizing the Middle Ground, 57 N.Y.U.L.Rev. 521, 562 (1982). Once a plaintiff proves that the lack of an adequate warning or instruction rendered the product unreasonably dangerous, his cause in fact burden is assisted by a presumption: when a manufacturer fails to give adequate warnings or instructions, a presumption arises that the user would have read and heeded such admonitions. Benoit v. Ryan Chevrolet, 428 So.2d 489, 493 (La.App. 2d Cir.1982); Technical Chemical Co. v. Jacobs, 480 S.W.2d 602, 606 (Tex.1972); Wolfe v. Ford Motor Co., 6 Mass.App. 346, 376 N.E.2d 143 (1978); Nissen Trampoline Co. v. Terre Haute First National Bank, 332 N.E.2d 820, 826-27 (Ind.App.Ct.1975); Reyes v. Wyeth Laboratories, 498 F.2d 1264, 1281-82 (5th Cir. 1974); Jackson v. Johns-Mansville Sales Corp., 727 F.2d 506, 523 (5th Cir. 1984). The presumption, may, however, be rebutted if the manufacturer produces contrary evidence which persuades the trier of fact that an adequate warning or instruction would have been futile under the circumstances. Cf. Magro v. Ragsdale Bros., Inc., 721 S.W.2d 832 (Tex.1986); See Note, Products Liability, 50 Tex.L.Rev. 577 (1972); McCormick on Evidence, 3d ed. § 343 (1984).
Assuming the role of the trier of facts once again, we conclude that because the plaintiffs proved that the manufacturer failed to give adequate warnings as to the Firebird's incendiary propensities, a presumption arose that the user, Lonnie Bloxom, would read and heed such a warning had it been given. However, when we examine the evidence, we find that the manufacturer has fulfilled not only its burden of producing contrary evidence but also its burden of persuading us that even an adequate warning in the owner's manual would have been futile in this case. Lonnie Bloxom testified on both direct and cross examination that he had not read any part of his owner's manual prior to the fire. He stated that it was not his practice to refer to an automobile operator's manual unless there was something wrong with the car. Accordingly, even if an adequate warning of the particular danger in this case had been given by a proper provision *851 in the manual, such a warning would have been futile because Lonnie Bloxom did not read the manual before parking his car over combustible materials.
For the reasons assigned, we conclude that while the plaintiffs proved most of the elements of their case, they failed to prove that the lack of an adequate warning was a cause in fact of the damages they sustained, and the court of appeal therefore reached the correct result. Accordingly, the court of appeal judgment is affirmed.
AFFIRMED.
LEMMON, J., concurs and assigns reasons.
MARCUS, J., concurs in the result.
DIXON, C.J., and WATSON, J., dissent.