666 So.2d 727 (1995)
Carol MITCHELL, wife of/and William Mitchell
v.
UNIROYAL GOODRICH TIRE COMPANY, INC., the Performance Tire Company, Inc., and CIGNA Insurance Company.
No. 95-CA-0403.
Court of Appeal of Louisiana, Fourth Circuit.
December 28, 1995.
Writ Denied March 15, 1996.
*728 Darleen M. Jacobs, and James L. Yates, New Orleans, for Appellants.
Jones, Walker, Waechter, Poitevent, Carrere & Denegre, John J. Weigel, Madeleine Fischer, New Orleans, for Appellee, Uniroyal Goodrich Tire Company, Inc.
Borrello, Huber & Dubuclet, Stephen L. Huber, Metairie, for Appellee, Performance Tire Company, Inc.
Before BARRY, CIACCIO and MURRAY, JJ.
BARRY, Judge.
The trial court disallowed the testimony of plaintiffs' expert witness. The issue is whether that testimony is admissible under La.C.E. art. 702. We affirm.[1]

Facts
On May 23, 1990 Carol and William Mitchell were on an interstate highway when the tread on a tire separated from its underlying steel belt. Plaintiffs allege the car swerved, Mr. Mitchell was thrown against his door and was injured. The tread had stripped away, but the tire retained enough rubber and air to allow the Mitchells to proceed from where the incident occurred in Alabama to Pensacola, Florida where the tire was replaced. The tire did not blow out.
Mr. Mitchell purchased the tire from Performance Tire in 1986 as one of four new tires. The tire was manufactured by B.F. Goodrich which later merged with Uniroyal Goodrich.
The Mitchells sued Uniroyal Goodrich Tire Company, Inc., the manufacturer; Performance Tire Company, Inc., seller; and CIGNA Insurance Company, Uniroyal's liability insurer. The trial court granted a directed verdict to defendants on liability.
Plaintiffs retained Dr. Gordon Goldman as an expert in chemistry, in particular the properties of plastics, polymers and adhesives, in order to investigate the cause of the tire's failure. Dr. Goldman prepared a report identifying manufacturing defects as the probable cause. He also described the types of manufacturing defects which, in his opinion, could lead to such a tire failure.
The day of trial Uniroyal Goodrich moved to exclude Dr. Goldman's testimony. The trial judge held a hearing on the motion outside the presence of the jury and disallowed the testimony.[2]

*729 Analysis

The admissibility of expert testimony is governed by La.C.E. art. 702:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
The decision to admit or exclude expert testimony is within the sound discretion of the trial court. La.C.E. art. 702, comment (d); Clement v. Griffin, 91-1664 (La.App. 4 Cir. 3/3/94), 634 So.2d 412, 424, writs den. 94-0717, 94-0777, 94-0789, 94-0791, 94-0799, 94-0800 (La. 5/20/94), 637 So.2d 478-79. The trial judge has great latitude in deciding whether a proffered expert has the competence, background and experience to testify as an expert. Clement, 634 So.2d at 424. The decision whether to qualify an expert may not be reversed in the absence of clear error. Id.
Article 702 is identical to Federal Rule of Evidence 702, and Louisiana jurisprudence on admissibility of expert testimony generally follows federal interpretation. Clement, 634 So.2d at 426.
Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) considered the admissibility of scientific expert testimony pertaining to new scientific knowledge under Rule 702. Daubert requires that the trial judge ensure all such testimony which is admitted "is not only relevant, but reliable." Daubert, 509 U.S. at ___, 113 S.Ct. at 2795. Daubert enumerated illustrative considerations to determine whether the reasoning or methodology underlying the testimony is scientifically valid and can properly be applied to the facts at issue: 1) the "testability" of the expert's theory or technique, 2) whether the theory or technique has been subjected to peer review and publication, 3) the known or potential rate of error, and 4) whether the methodology is generally accepted in the scientific community. Daubert, 509 U.S. at ___ _ ___, 113 S.Ct. at 2796-2797.
The Daubert analysis was adopted by the Louisiana Supreme Court in State v. Foret, 628 So.2d 1116, 1123 (La.1993), which considered the admissibility of a psychologist's expert testimony.
Plaintiffs argue the Daubert criteria are inapplicable because, unlike the scientific theory in Daubert and Foret, the relevant information by Dr. Goldman is not experimental or theoretical and cannot be expressed in terms of rate of error.
Though Daubert and Foret involved expert scientific testimony, the considerations for determining reliability and relevance of the testimony were applied to expert testimony concerning an alleged tire manufacturing defect in Clement, 634 So.2d at 426-427. In Clement the theory was that a piece of glass-like black substance might have been embedded in the tire and caused the failure. Plaintiff's expert was a mechanical engineer who did not actually see the object before reaching his conclusions. Clement held the trial court erred by allowing the witness to give expert testimony concerning an alleged tire manufacturing defect because the testimony did not satisfy the Daubert test for reliability and relevance.
Dr. Goldman testified he has never investigated the separation of tread from a tire or looked at the specifications of the subject tire, the type of steel involved, or the specifications of the compounds used in the rubber of this tire. He did not review any formulations or patents pertaining to this tire.
He testified he previously worked for a manufacturer of polymers, but he did not know if any of those polymers were ever used by a tire company.
Dr. Goldman's tire related experience is limited to work on raw materials that might have been used in the manufacture of tires. Dr. Goldman could not state with certainty whether those materials were used on tires manufactured by the defendant or on the tire in question. On one occasion Dr. Goldman was asked to run tests on a tire inflation device. In short, he had no prior experience with tires.
He cited no precedent for the method he employed to calculate the amount of wear the *730 tire had sustained and what its remaining useful life should have been.
Dr. Goldman postulated various theories as to what caused the tread to separate from the tire, but he could not identify the cause. He speculated that a foreign material trapped between the tire bead and the rim during manufacture could have led to a loss of air; the "BLEM" branding imprint could have caused a very small pinhole during the manufacturing;[3] during production, air could have been trapped in the tire walls in the presence of excessive heat during the cooling time which caused the bonder tread to separate. He opined that Goodrich might have made very small pinholes in the tire during its manufacture. Corrosion could have occurred during the manufacturing process and caused a loss of bonding with the tread.
Dr. Goldman admitted that air and water can leak into a tire when the tire is in service. He admitted that a puncture, overinflation, underinflation, and overdeflection can cause air or water to leak into a tire. Dr. Goldman agreed that a tubeless tire can have a puncture that does not go to the inner liner and the tire could corrode without losing air. Dr. Goldman used a magnifying glass and could not find a pinhole or any wear from the "BLEM" imprint.
Dr. Goldman took very small samples of rubber from the tread of the other three tires to determine if there was any sulfate compound which would indicate corrosion. He found none.
Dr. Goldman testified he had not seen the formulations used in the adhesives in the rubber, the coating, or the rubber part of the tire and had no evidence that they were faulty. Dr. Goldman did not know whether the manufacturing process changed since publication of literature he read on the subject. Dr. Goldman's testimony as to what he knew about the manufacture and composition of B.F. Goodrich tires and when he knew it was vague and unpersuasive.
Dr. Goldman did not substantiate the methodology he used. He recalled old literature he read about tires, a field in which he had no prior experience. He looked at the tires and concluded that because the tread on one tire separated after over three and one-half years of use the tire must have had a manufacturing defect.
Q. Doctor [Goldman], I'm going to ask you the question again. What evidence do you have based upon your evaluation of this tire and any other tires that you looked at in this case that there was improper bonding?
A. Well, I can sayit's obvious that there was improper bonding, because the tread separated from the carcass, from the steel cord.
* * * * * *
Q. And all of these booksthe books that you read about the manufacturing process, did that pertain to a particular aspect, such as air entrapment; or did it pertain to something like a foreign particle?
A. It pertained to the process for manufacturing the tire.
Q. And it just pertained to a general process, not any particular manufacturer. Is that correct?
A. That is correct.
Q. What particular type of process was used in this case, you have no idea?
A. I have not seen the procedure used by B.F. Goodrich.
Dr. Goldman opined that the tire's failure was not caused by poor maintenance because the other three tires would have sustained damage. However, he said the other tires showed signs of tread separation, but admitted he did not know the condition of the tire in question prior to its failure.
The record does not show the standard or methodology employed by Dr. Goldman's to support his theory. Dr. Goldman was unfamiliar with compounds used in the manufacturing process. Dr. Goldman's reference materials were dated and he did not know whether or the extent the manufacturing processes have changed. There is no indication his theory has been considered and tested under current manufacturing standards. *731 There is no indication of a potential rate of error.
The trial judge did not abuse his discretion by excluding the testimony of Dr. Goldman. We affirm.
AFFIRMED.
MURRAY, J., concurs with reasons.
MURRAY, Judge, concurring with reasons.
I agree with the majority's conclusion that Dr. Goldman's experience, background and methodology (or lack thereof) was insufficient to qualify him as an expert under La. Code Evid.Ann. art. 702. However, I do not believe the Daubert analysis is appropriate here. Nevertheless, since Clement v. Griffin is the rule of this Circuit, I concur in the result here.
NOTES
[1] Performance Tire Company answered the appeal. Performance argues that in the event this Court modifies or reverses the judgment Performance is entitled to judgment on its cross claim against Uniroyal Goodrich. Because we affirm, that issue is moot.
[2] At the time of the trial, the plaintiffs objected that the defendants waited until the trial to object to Dr. Goldman's testimony. That issue was not raised on appeal and is not considered.
[3] The faulty tire had the letters "BLEM" stamped on it which indicates the existence of a cosmetic defect. We assume the word "blemish" applies.