712 So.2d 543 (1998)
C. Robert BALLAM and Cheryl Ballam
v.
SEIBELS BRUCE INSURANCE COMPANY, Christian Schubert and Champion Insurance Company.
No. 97-CA-1444.
Court of Appeal of Louisiana, Fourth Circuit.
April 1, 1998.
*545 Michael R. Guidry and Owen J. Bradley, New Orleans, for Plaintiffs/Appellees C. Robert Ballam and Cheryl Ballam.
B. Frank Davis, Howard B. Kaplan, Robert A. Knight, Bernard, Cassisa, Elliott & Davis, Metairie, for Defendant/Appellant General Motors Corporation.
Before BYRNES, ARMSTRONG and MURRAY, JJ.
ARMSTRONG, Judge.
This is a products liability action based upon a theory of failure-to-warn. The plaintiff was burned while priming a car's carburetor. He sued various parties including the manufacturer of the car. After settlements or dismissals of all parties but the car's manufacturer, a jury trial was held on the plaintiffs' failure-to-warn claims against that manufacturer. The jury found the plaintiff to be 85% at fault and the manufacturer to be 15% at fault. On a post-trial motion, the trial court reallocated 1% fault to the car's owner. The manufacturer argues on appeal that: (1) certain expert testimony should not have been admitted; (2) the jury was clearly wrong in finding that lack of an adequate warning caused the plaintiff's injury; and (3) the plaintiff's claim is prescribed. We find no abuse of discretion in the admission of the expert testimony and no clear error in the jury's factual finding that the plaintiff's injury was caused by lack of an adequate warning. We also find that, as a matter of law, the plaintiffs' claim is not prescribed. There is no appeal by the plaintiff as to the allocation of fault by the jury or the 1% reallocation of fault by the trial court (or any other issue) and there is no appeal by the manufacturer as to the quantum of damages. We affirm the judgment of the trial court.
The car in question was owned by Celeste Morrell. It was a 1980 Oldsmobile Cutlass manufactured by defendant General Motors Corporation ("GMC"). On May 12, 1988, the car would not start. Edward Salisbury, who was visiting at the time, attempted to start the car. He suspected that it was out of gas. He raised the hood and removed the air filter to see whether the engine was receiving gas and determined that it was not.
Plaintiff Robert Ballam observed Mr. Salisbury trying to start the car and began to assist him. They decided to try priming the carburetor. Mr. Ballam got a cup of gasoline and poured some of it into the carburetor. Mr. Salisbury, after checking to see that Mr. Ballam was away from the carburetor, cranked the engine. They attempted this priming technique at least once without success and without untoward incident. Mr. Ballam stood in front of the engine compartment about four feet from the mouth of the carburetor. He had the cup with a small amount of gasoline in his hand.
On the second (or later) attempt to start the car, there was a powerful backfire, and a flame from the mouth of the carburetor burned Mr. Ballam severely (apparently both directly and by igniting the cup of gasoline in his hand). One of Mr. Ballam's expert witnesses, Jay Bolt, who is a well-qualified expert on carburetor and fuel systems (and whose testimony is not challenged on appeal by GMC) explained the mechanism of the accident: A carburetor backfire occurred in which the engine backfired through the intake manifold (the pipe to which the carburetor is attached) rather than through the tailpipe. Such backfires can cause a flame to come out of the mouth of the carburetor. If the air filter is in place, it acts as a flame arrestor to prevent a carburetor backfire flame from getting into the engine compartment and starting a fire there or burning someone nearby. The most dangerous situation *546 occurs when the air filter is removed and liquid gasoline has collected in the intake manifold because a backfire can both ignite the gasoline and propel it from the intake manifold and out of the carburetor producing a flame-thrower type of effect. Mr. Bolt opined that this flame-thrower type of backfire is what burned Mr. Ballam. Also, that is consistent with Mr. Ballam's and Mr. Salisbury's descriptions of the flame that burned Mr. Ballam.
The crux of Mr. Ballam's claim against GMC is that there was a lack of adequate warning because there was no warning sticker on or near the air filter cautioning as to the fire/burn danger presented by backfire when the air filter is removed. GMC did place a warning in the car owner's manual, and the parties debate its adequacy, but this is not really an issue as it is uncontested that Mr. Ballam never read the manual. See Bloxom v. Bloxom, 512 So.2d 839 (La.1987) (inadequacy of warning in manual of no consequence because plaintiff did not read the manual).

ADMISSIBILITY OF EXPERT TESTIMONY
Mr. Ballam presented the expert testimony of Dennis Howard. The trial court allowed Mr. Howard to testify as a safety expert and, in particular, to testify as to whether a warning sticker should have been placed on or near the air filter. GMC argues that this testimony of Mr. Howard should not have been allowed because: (1) Mr. Howard was not qualified to give such testimony; and (2) the testimony did not satisfy the reliability requirements for expert testimony imposed by recent caselaw.
The starting point for our analysis of these issues is Article 702 of the Code of Evidence which states in its entirety:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
La.Code Evid. art. 702. We note Comment (d) to Article 702 which states that: "Broad discretion should be accorded the trial judge in his determination as to whether expert testimony should be held admissible and who should or should not be permitted to testify as an expert." At least as to the issue of who should or should not be allowed to testify as an expert, it is very well established in the caselaw that the trial court has discretion and will not be reversed on appeal absent clear error. Mistich v. Volkswagon of Germany, Inc., 95-0939 (La.1/29/96), 666 So.2d 1073, 1079; Mitchell v. Uniroyal Goodrich Tire Co., 95-0403 (La.App. 4 Cir. 12/28/95), 666 So.2d 727, 729; Clement v. Griffin, 91-1664, 92-1001, 93-0591 to 93-0597, 93-0648, 634 So.2d 412, 424 (La.App. 4 Cir. 3/3/94), writ denied, 94-0717, 94-0777, 94-0789, 94-0791, 94-0799, 94-0800 (La.5/20/97), 637 So.2d 478-79. It also appears that we have held that the trial court's decisions in applying the new reliability standards for expert testimony are also subject to reversal only for abuse of discretion or manifest error, Williamson v. Haynes Best Western of Alexandria, 95-1725 (La.App. 4 Cir. 1/29/97), 688 So.2d 1201, 1241, and this is consistent with Article 702, Comment (d)'s provision that the trial court has broad discretion "as to whether expert testimony should be held admissible." Thus, we will apply the abuse of discretion/clear error standard of review to both of the expert witness issues raised by GMC.

Mr. Howard's Qualifications
Mr. Howard is an expert in safety and, particularly, the recognizing of hazards and recommending solutions. The trial court found him qualified to testify as an expert in safety.
Mr. Howard received a degree in Industrial Management from Florida State University in 1968. While employed by Aetna Casualty and Surety Company as a Loss Control Engineer, he did safety-related work and took many safety-related training courses. In particular, Mr. Howard's work for Aetna consisted of performing evaluations for Aetna underwriters of potential risks or hazards associated with the products of Aetna's insureds. Also while in Aetna's employ, Mr. Howard evaluated warnings used by various large companies. Given the nature of the *547 insurance business, the nature of Mr. Howard's work for Aetna, and the size and name recognition of Aetna in the insurance business, Mr. Howard's work at Aetna is a most significant credential as to his qualification to opine as a safety expert. Later, Mr. Howard was employed in safety-related capacities by Boise Cascade and Kaiser Aluminum and Chemical. His safety-related employment by these two large, well known companies is also a significant credential. Since then, Mr. Howard has had his own safety consulting business. Mr. Howard is a member of numerous safety-related societies and organizations and has taught various safety-related classes and courses. Of particular importance to the present case, Mr. Howard testified that he had made a study of warnings for more than twenty-five years.
GMC argues that Mr. Howard should not have been allowed to testify because he did not have prior experience with and had not made any study of "automobile carburetor warnings." However, while Mr. Howard did not have prior experience with automobile carburetor warnings in particular, his knowledge of warnings on products included knowledge of various principles which, it is apparent from his testimony, he maintains to be applicable to automobile carburetor warnings. Moreover, GMC has not given any reason why Mr. Howard's knowledge of product warnings is inapplicable to automobile carburetor warnings. While Mr. Howard's lack of prior experience with automobile carburetor warnings was a proper subject of cross-examination, and could properly be considered by the jury in weighing Mr. Howard's testimony, it does not render the trial court's determination that Mr. Howard was qualified to testify as an expert witness an abuse of discretion or clear error.

Mr. Howard's testimony
GMC argues that Mr. Howard's testimony did not meet the standards for reliability of expert testimony imposed in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), adopted in Louisiana by State v. Foret, 628 So.2d 1116 (La.1993), and applied by this court in Clement v. Griffin, 91-1664, 92-1001, 93-0591 to 93-0597, 93-0648 (La.App. 4 Cir. 3/3/94), 634 So.2d 412, 426-27, writ denied, 94-0717, 94-0777, 94-0789, 94-0791, 94-0799, 94-0800 (La.5/20/97), 637 So.2d 478-79.
In Daubert, the Court overruled the well-known case on admissibility of scientific expert testimony, Frye v. United States, 293 F. 1013 (D.C.Cir.1923), which had held that such testimony is inadmissible unless it is based on a scientific technique which is "generally accepted" as reliable in the relevant scientific community. Daubert overruled Frye on the ground that Frye's "general acceptance" test is inconsistent with the rather more liberal approach of Rule 702[1] of the much later-adopted Federal Rules of Evidence. However, Daubert also held that, even under Rule 702, "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." 509 U.S. at 589, 113 S.Ct. at 2795.
The Daubert court noted that Rule 702 allows expert scientific testimony when "scientific knowledge" will assist the trier of fact. Id. The Court also stated that "in order to qualify as `scientific knowledge,' an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation i.e., `good grounds' based on what is known. In short, the requirement that an expert's testimony pertain to `scientific knowledge' establishes a standard of evidentiary reliability." 509 U.S. at 590, 113 S.Ct. at 2795.
In order to give some guidance as to whether proposed testimony will pertain to "scientific knowledge," the Daubert court offered four "general observations" that should be considered by the trial court: (1) whether the theory or technique that is the subject of the proposed testimony "can be (and has been) tested"; (2) whether the theory or technique "has been subjected to peer review and publication"; (3) a technique's "known or potential rule of error"; and (4) whether there is "general acceptance" of a theory or *548 technique within the relevant scientific community. 509 U.S. at 593-94, 113 S.Ct. at 2797. The Daubert court introduced its four "general observations" by stating: "Many factors will bear on the inquiry, and we do not presume to set out a definitive checklist or test." 509 U.S. at 593, 113 S.Ct. at 2797. The court concluded its list of four general observations by stating: "The inquiry envisioned by Rule 702 is, we emphasize, a flexible one." Thus, the "general observations" listed in Daubert are not a list of requirements that must be met in each instance of proposed expert testimony nor even a list of factors that are necessarily applicable to all types of expert testimony. We read the Foret court's adoption of Daubert in light of the foregoing.
We also note that Daubert itself limited its holding to "scientific" expert testimony while noting that Rule 702 also allows expert testimony based upon "technical or other specialized knowledge." 509 U.S. at 589-90 n. 8, 113 S.Ct. at 2795 n. 8. See United States v. 14.38 Acres of Land, 80 F.3d 1074, 1078 and n. 3 (5th Cir.1996) (outside the context of scientific expert testimony, Daubert does not "work a sea change"). Compare Mitchell v. Uniroyal Goodrich Tire Company, Inc., 95-0403 (La.App. 4 Cir. 12/28/95), 666 So.2d 727 (Daubert applied to chemist's analysis of tire failure) with Fowler v. Bauman, 95-0145 (La.App. 4 Cir. 10/12/95), 663 So.2d 438, 440 (Daubert's four general observations not applied to accident reconstruction expert's testimony which was based upon "principles which have been widely accepted in the courts for many years."). Mr. Howard's testimony as to the need to place a warning sticker on or near the air filter is more easily characterized as "technical or other specialized knowledge" than as "scientific" knowledge. Thus, one would not expect the four general observations of Daubert to be readily applied, if they are applicable at all, to Mr. Howard's testimony. See Williamson v. Haynes Best Western of Alexandria, 95-1725 (La.App. 4 Cir. 1/29/97), 688 So.2d 1201, 1241 (Insurance fraud experts' testimony "not readily susceptible of analysis under the Daubert/Foret principles.").
However, in order to give GMC the benefit of the doubt, we will consider the four Daubert general observations with respect to Mr. Howard's testimony. First, while Mr. Howard's theory that a warning sticker on or near the air filter has not been tested, it is, in principle, testable. That is, empirical data as to the effect of warnings on or near the air filter could be gathered by experiment or otherwise in order to estimate the validity of Mr. Howard's theory. It is this element of "refutability," "falsifiability" or "testability" which gives scientific status to a theory. 509 U.S. at 593, 113 S.Ct. at 2797. Second, while Mr. Howard's theory has not (so far as the record reveals) been the subject of peer review or publication, he based his opinion in part (specifically, his opinion of the degree of danger from carburetor priming) on articles giving statistical analysis of burn injuries from carburetor priming which articles were published in well-known medical journals. Third, because Mr. Howard's opinion advanced a theory, rather than a technique, "the known and potential rate of error" and "the existence and maintenance of standards controlling the technique's operation," are not applicable. Fourth, based upon Mr. Howard's testimony, it appears that general principles upon which he relied (particularly the place and role of warnings in the hierarchy of loss-prevention techniques) probably do command general acceptance among safety professionals. See generally Cannon v. Cavalier Corp., 572 So.2d 299, 305-306 (La. App. 2d Cir.1990) (recognizing Mr. Howard as safety expert and relying upon his testimony as to safety principles applicable to warnings). In sum, while the results of this application of Daubert's four general observations are mixed, it is not manifest from them that Mr. Howard's testimony was not reliable. Particularly in light of the limited (if any) application of Daubert to Mr. Howard's testimony, we cannot find that there was clear error by the trial court in deciding to admit Mr. Howard's testimony. The trial court did not abuse its discretion.

WHETHER MR. BALLAM'S INJURY WAS CAUSED BY AN INADEQUATE WARNING
GMC argues that (1) it was not necessary to place a warning sticker on or near the air *549 filter and (2) the lack of a warning sticker on the air filter did not cause Mr. Ballam's injury because Mr. Ballam would not have seen it.

Lack of A Warning Sticker On Or Near the Air Filter
We previously have held that the "the issue of where the warning must be placed must be considered simply as one aspect of whether or not the warning is adequate." Black v. Gorman-Rupp, 94-1494 (La.App. 4 Cir. 5/16/95), 655 So.2d 717, 723 (citing Bloxom). "Whether a particular warning was adequate is a question for the trier of fact." Bloxom v. Bloxom, 512 So.2d 839, 844 (La. 1987). Thus, in the present case, the issue of whether a warning sticker needed to be placed on or near the air filter was a factual one to be decided by the jury. The jury's determination of this factual issue can be disturbed upon appeal only if it is clearly wrong/manifestly erroneous. E.g., Hines v. Remington Arms Company, Inc., 94-0455 (La.12/8/94), 648 So.2d 331, 335; Ambrose v. New Orleans Police Dept. Ambulance Service, 93-3099, 93-3110, 93-3112 (La.7/5/94), 639 So.2d 216. So long as the jury's view of the evidence is reasonable, it must be upheld. Id.
As discussed above, Mr. Howard testified that a warning sticker on or near the air filter was necessary. This was supported, albeit indirectly, by the testimony of Mr. Bolt as to the dangers of carburetor backfires when the air filter is removed. Also, the plaintiff presented the testimony (by deposition) of Dr. Jesse Meredith, who is a surgeon and amateur car mechanic, as to many carburetor backfire injuries he had seen and a letter he wrote to Popular Mechanics to warn of that hazard. GMC presented the expert testimony of Dr. June Welch to the effect that a warning sticker on or near the carburetor was not called for.
We previously have held that in deciding the issue of whether a warning must be placed on the product itself (as opposed to only in a manual): "Consideration must be given to the nature and severity of the danger to be warned against, the likelihood that the product will be used by persons who have not read the manual, the practicality and effectiveness of placing the warning on the product and any other relevant factors." Black, 655 So.2d at 723. Mr. Howard testified that the danger from carburetor backfire is one of the top three or four dangers in the engine compartment of a vehicle. He also made reference to medical journals with statistics as to the frequency of burns from attempts at carburetor priming. Mr. Howard testified, and common experience suggests, that persons priming carburetors are likely to do so without first reading through an automobile owners manual (e.g. a car stalled on the side of the road). At least arguably, placing a warning sticker on or near the air filter would have been practical and effective. The carburetor backfire danger is presented when the air filter is removed and so such a warning sticker would give the warning at the exact place and time that it was needed.
Considering the above-discussed evidence and law, we cannot say that the jury was clearly wrong/manifestly erroneous in finding that a warning sticker should have been placed on or near the air filter.
GMC also argues that it had no duty to warn of the danger of carburetor priming because the car was not in "normal use" during such carburetor priming. See Hines, 648 So.2d at 337 (manufacturer's duty is to warn of dangers "inherent in the normal use of its product"). But, "normal use" in this context "is a term of art that includes all intended uses, as well as all foreseeable uses and misuses of the product." Bloxom, 512 So.2d at 843 (emphasis added). The "manufacturer may not simply close his eyes to hazards associated with foreseeable misuse of the product." Id. Accord Clark v. Jesuit High School of New Orleans, 96-1307 (La. App. 4 Cir. 12/27/96), 686 So.2d 998, 1002. Mr. Ballam introduced into evidence an article from Popular Science and an excerpt from the Readers Digest Complete Car Care Manual which recommended the very carburetor priming procedure employed by Mr. Ballam and Mr. Salisbury. Also, Mr. Ballam relied upon the previously-mentioned medical journal articles with statistics as to the common occurrence of burn injuries from carburetor *550 priming. The jury was not clearly wrong/manifestly erroneous in concluding that carburetor priming was a foreseeable use (or misuse) of the car so as to constitute "normal use."
GMC also argues that it had no duty to place a warning sticker on or near the air filter because the danger of carburetor backfire was obvious and/or well known to Mr. Ballam. A manufacturer's duty to warn "does not encompass dangers that are or should be obvious to the ordinary user.... This is particularly so when the user is familiar with the product, making him a `sophisticated user'." Hines, 648 So.2d at 337. The record does not support GMC's argument. Mr. Ballam had taken a beginning course in auto mechanics in high school, had done some work on his own car and occasionally assisted friends and relatives with their cars. However, the danger described by Mr. Ballam's carburetor and fuel systems expert witness, Mr. Bolt, is one of which Mr. Ballam was not aware and (so far as the record shows) should not have been aware. Specifically, the danger was that, with the air filter removed, and liquid gasoline accumulated in the intake manifold, a strong carburetor backfire would shoot a stream of burning gasoline for several feet. It should be recalled that Mr. Ballam did not, for example, stand looking down at the carburetor with his face directly over it. Instead, he stood in front of the car, about four feet from the mouth of the carburetor. The record does not show that it was or should have been obvious to Mr. Ballam that he was in danger while in that position. The jury was not clearly wrong/manifestly erroneous in finding the danger not obvious to Mr. Ballam.

Causation of the Injury
GMC argues that there was an absence of causation of Mr. Ballam's injury by the lack of a warning sticker on or near the air filter. "An essential element of the plaintiff's cause of action for failure to adequately warn of a product's danger is that there be some reasonable connection between the omission of the manufacturer and the damage which the plaintiff has suffered." Bloxom, 512 So.2d at 850. Accord Delery v. Prudential Ins. Co. of America, 94-0352 (La. App. 4 Cir. 9/29/94), 643 So.2d 807, 814.
GMC first points out that Mr. Salisbury had removed the air filter before Mr. Ballam began assisting him in the priming of the carburetor. However, Mr. Ballam argues that, if a warning sticker had been present on or near the air filter, Mr. Salisbury would have seen it and, presumably, would have warned Mr. Ballam to stand farther away. See Bloxom, 512 So.2d at 850 (in cases of inadequate warning, plaintiff benefits from presumption that warning would have been read and heeded). Moreover, the short block of the engine of the car had been changed, which involved taking off various parts including the air filter, carburetor and intake manifold and replacing them on the new short block. Mr. Ballam had assisted in this work and he argues that, if a warning sticker had been present on or near the air filter, then he most likely would have seen it while changing the short block. The jury evidently concluded that Mr. Ballam was correct as to one or both of these arguments and we cannot say that the jury was clearly wrong/manifestly erroneous in that respect.
GMC argues that, because "the engine" of the car was changed, Mr. Ballam did not prove that "any warnings which should have been in the engine compartment would have been present when the accident occurred." First, as discussed above, Mr. Ballam argues that, if a warning sticker had been on or near the air filter, then he would have seen it while changing the short block. Second, the air filter, carburetor and intake manifold were taken off of the old short block and put on the new short block. Thus, if a warning sticker had been placed on the air filter, then it still would have been present on the date of the accident because the air filter was placed on the new short block in the car. Thus, we cannot say that the jury was clearly wrong/manifestly erroneous in rejecting this argument of GMC.

PRESCRIPTION
GMC argues that the case was prescribed because GMC was not sued within one year of the accident and because no *551 party who was sued within one year of the accident was solidarily liable with GMC. We disagree. Mr. Ballam's uninsured/underinsured motorist ("UM") insurer was sued within one year of the accident and was a solidary obligor with GMC.
The accident occurred on May 12, 1988. On January 3, 1989, Mr. Ballam sued, among others, Champion Insurance Company in its capacity as automobile liability insurer of Celeste Abadie Morrell (Ms. Morrell was not sued at that time) and Champion Insurance Company in its capacity as uninsured/underinsured motorist ("UM") insurer of Mr. Ballam. The Louisiana Insurance Guaranty Association ("LIGA") was added as a defendant, apparently due to insolvency of Champion, by a supplemental petition on August 25, 1989. On July 2, 1992 a second supplemental petition added Celeste Abadie Morrell and GMC as defendants.
Mr. Ballam settled his UM claim and dismissed LIGA as successor to Champion in its capacity as Mr. Ballam's UM insurer on October 5, 1994.
Mr. Ballam settled his claim against Ms. Morrell and LIGA as successor to Champion in its capacity as Ms. Morrell's automobile liability insurer and dismissed his claims against them on August 4, 1995.
Mr. Ballam's claims against GMC were tried. The jury assessed fault 85% to Mr. Ballam and 15% to GMC. No fault was assessed against Ms. Morrell.
Acting upon a post-trial motion of Mr. Ballam, the trial court reallocated 1% fault to Ms. Morrell and reduced the fault allocation against GMC from 15% to 14%. The trial court then denied GMC's exception of prescription on the ground that: "Because Celeste Abadie Morrell is at fault for plaintiff's injuries, she is a joint tortfeasor with General Motors Corporation. Therefore, the Supplemental and Amending Petition filed [against GMC] on July 9, 1992, relates back to the original petition."
GMC argues that it was error for the trial court to reallocate 1% fault to Ms. Morrell, and, therefore, Ms. Morrell is not a solidary obligor with GMC. Consequently, the timely suit against Ms. Morrell's liability insurer (Champion) did not interrupt prescription as to GMC. GMC goes on to argue that, because GMC itself was not sued within one year of the accident, Mr. Ballam's claim against GMC is prescribed.
We believe that the controversy as to the reallocation of 1% fault to Ms. Morrell is irrelevant to the issue of prescription. Regardless of whether Ms. Morrell is a solidary obligor with GMC, Mr. Ballam's claim against GMC is not prescribed. That is because Champion, in its capacity as Mr. Ballam's UM insurer, was sued within one year of the accident and is a solidary obligor with GMC.
Two persons may be solidary obligors regardless of whether their obligations arise from different sources. La. Civ.Code art. 1797. Interruption of prescription against one solidary obligor interrupts prescription against the other solidary obligors. La. Civ.Code arts. 1799, 3503. A plaintiff's UM insurer and the tortfeasor are solidary obligors and, therefore, timely suit against one of them interrupts prescription as to the other. Hoefly v. Government Employees Ins. Co., 418 So.2d 575 (La.1982). See also Narcise v. Illinois Central Gulf Railroad Co., 427 So.2d 1192, 1194-95 (La.1983) (citing Hoefly); Molony v. United Services Automobile Association, 96-1747 (La.App. 4 Cir. 11/6/96), 683 So.2d 891, 893 (citing Hoefly). Moreover, although the plaintiff's UM insurer and the tortfeasor may be liable for different amounts, that is of no consequence to the issue of prescription. The plaintiff's UM insurer and the tortfeasor are solidary obligors because they are each obligated to repair some of the same elements of the plaintiff's damages and, once prescription is interrupted by suit against the UM insurer, the plaintiff is free to bring whatever claims he has against the tortfeasor. See Williams v. Sewerage & Water Board of New Orleans, 611 So.2d 1383, 1387 (La.1993); Vincent v. Tusch, 618 So.2d 385, 386 (La.1993); Lewing v. Sabine Parish Police Jury, 95-630 (La. App. 3rd Cir. 11/2/95), 664 So.2d 598, 600.
GMC cites Rizer v. American Surety and Fidelity Ins. Co., 95-1200 (La.3/8/96), 669 So.2d 387, for the proposition that GMC, as a *552 tortfeasor, is not a solidary obligor with Champion/LIGA as Mr. Ballam's UM insurer. GMC's reliance upon Rizer is wholly misplaced. Rizer addressed the issue of whether the tortfeasor's liability insurer (not the tortfeasor) is solidarily liable with the plaintiff's UM insurer. Rizer concluded that the tortfeasor's liability insurer and the plaintiff's UM insurer are not solidary obligors because solidary liability arises when two parties are "obliged to the same thing" (i.e. each is "obligated to repair the same damage" so that there are "coextensive" obligations) and a UM insurer is, by definition, only obligated if and to the extent that the tortfeasor's liability insurer is not obligated. Thus, by definition, "there is no overlap" between the plaintiff's UM insurer and the tortfeasor's liability insurer. None of this analysis of Rizer alters or effects the rule of Hoefly. Indeed, the Rizer court remarked that "under Hoefly, a tortfeasor and an uninsured motorist carrier are solidary obligors." 669 So.2d at 390. See Frank L. Maraist and Thomas C. Galligan, Jr., Louisiana Tort Law § 10-4(i) at 230-31 (1996) (comparing Hoefly and Rizer).
GMC lastly argues that, because Mr. Ballam settled and dismissed his claims against the defendants who were sued within one year of the accident (including Champion/LIGA as Mr. Ballam's UM insurer), the interruption of prescription from timely suit against those defendants is "lost" and, because GMC itself was not sued within one year of the accident, the claim against GMC is barred by prescription. GMC relies upon the second sentence of Civil Code Article 3463 which states: "Interruption is considered never to have occurred if the plaintiff abandons, voluntarily dismisses, or fails to prosecute the suit at the trial" (emphasis added). GMC asserts that Mr. Ballam "voluntarily dismissed," within the meaning of that phrase in Article 3463, his suit against the timely-sued defendants (including Champion/LIGA as Mr. Ballam's UM insurer). However, the caselaw decided under Article 3463 holds that, if the plaintiff moves to dismiss a claim against a defendant after a general appearance by that defendant, then the dismissal is not considered a "voluntary dismissal" within the meaning of Article 3463. Roger v. Estate of Moulton, 513 So.2d 1126, 1133 (La.1987); Adams v. Dupree, 94-2353 (La.App. 4 Cir. 10/12/95), 663 So.2d 433, 437, writ denied, 95-2750 (La.1/26/96), 666 So.2d 676. Champion/LIGA, as UM insurer of Mr. Ballam, made a general appearance by filing an answer long before it was dismissed. Therefore, Article 3463's provision as to "voluntary dismissal" is not applicable. The interruption of prescription as to GMC, by the filing of suit against GMC's solidary co-obligor, Champion/LIGA as Mr. Ballam's UM insurer, remains effective.
Finally, Mr. Ballam has not appealed the trial court's post-trial reallocation of 1% fault from GMC to Ms. Morrell. GMC has appealed that reallocation but only in the context of GMC's belief that the reallocation was the only basis upon which GMC's exception of prescription would be overruled. As we have held above that the reallocation is irrelevant to the issue of prescription, GMC certainly has no interest in objecting to that reallocation of fault from itself to Ms. Morrell. Consequently, we express no opinion as to whether the trial court's post-trial reallocation of 1% fault was correct, but leave that reallocation undisturbed.
For the foregoing reasons, the judgment of the trial court is affirmed.
AFFIRMED.
NOTES
[1] Rule 702 of the Federal Rules of Evidence is identical to Article 702 of the Louisiana Code of Evidence.