679 So.2d 913 (1996)
Bobbie M. HATAWAY, et al., Plaintiffs-Appellants,
v.
JEEP CORPORATION, et al., Defendants-Appellees.
No. 96-166.
Court of Appeal of Louisiana, Third Circuit.
August 14, 1996.
*914 Donald G. Kelly, Jeffrey Howerton Thomas, Natchitoches, for Bobbie M. Hataway, et al.
Colvin Gamble Norwood Jr., Mark N. Bodin, Burgain G. Hayes Jr., New Orleans, for Chrysler Corporation.
Before DOUCET, C.J., and YELVERTON, and PETERS, JJ.
DOUCET, Chief Judge.
In this products liability action involving a "rollover" accident of a Jeep CJ-7, plaintiffs, the widow and children of Leslie "Dub" Hataway, appeal a judgment of the trial court, pursuant to a jury verdict, dismissing their suit against Chrysler Corporation for damages in connection with the death of their husband and father, respectively. We affirm.

GENERAL FACTS
At approximately 10:30 A.M., December 2, 1989, Leslie "Dub" Hataway was driving his 1978 Jeep Renegade (a CJ-7 model) in a westerly direction on La. Highway 8, in Grant Parish. Mr. Hataway, who was towing a 16 foot long trailer loaded with a tractor and bushhog, was on his way to a hunting camp for a day's work. Mr. Hataway had borrowed the trailer from Mr. L.E. Brunson because his own trailer had a flat. When Mr. Brunson learned that Mr. Hataway intended to tow the trailer with his CJ-7 Jeep, Mr. Brunson warned Mr. Hataway to be careful because what he planned to do was dangerous. Mr. W.C. McBride was following Mr. Hataway with his own trailer, loaded similarly to the trailer being towed by Hataway. McBride was Hataway's cousin and was going to help bushhog the hunting camp. According to Mr. McBride the following sequence *915 of events took place as the two vehicles rounded a left-hand curve and descended a gentle grade. For some reason which was never established, the Hataway trailer began to fishtail causing the Jeep to veer to the right. The right tires of the Jeep left the roadway; the Jeep started to veer back to the left. At this point, Mr. McBride began to experience sway with his trailer. He became involved with trying to avoid an accident himself and when he next looked toward the Hataway rig, all he can remember seeing is the undercarriage of the Jeep. Mr. McBride's troubles continued and he left the roadway before regaining control and bringing his rig to a stop. It was then he saw Hataway on the ground in front of the Jeep.
Accident reconstruction experts theorize that as the Hataway vehicle regained the roadway, it began to yaw counterclockwise, rolled over 360 degrees and came to rest on its four wheels, partially straddling the midline of the highway almost facing the way it had come. At sometime during the foregoing chain of events, but before the Jeep rolled over, the trailer disconnected from the Jeep, traveled past the overturning vehicle and came to rest in the woods on the left hand side of the roadway forward of the spot the Jeep came to rest. The trailer did not strike the Jeep at any time after it disconnected. Mr. Hataway was ejected from the vehicle, sustained serious injuries, and died two days later at Rapides General Hospital without regaining consciousness.

LAW AND DISCUSSION (Includes specific, detailed facts)
This case involves application of the Louisiana Products Liability Act, La.R.S. 9:2800.51, et seq. which took effect September 1, 1988. La.R.S. 9:2800.54 states a manufacturer's general liability and the burden of proof requirement thusly:
A. The manufacturer of a product shall be liable to a claimant for damage proximately caused by a characteristic of the product that renders the product unreasonably dangerous when such damage arose from a reasonably anticipated use of the product by the claimant or another person or entity.
B. A product is unreasonably dangerous if and only if:
(1) The product is unreasonably dangerous in construction or composition as provided in R.S. 9:2800.55;
(2) The product is unreasonably dangerous in design as provided in R.S. 9:2800.56;
(3) The product is unreasonably dangerous because an adequate warning about the product has not been provided as provided in R.S. 9:2800.57; or
(4) The product is unreasonably dangerous because it does not conform to an express warranty of the manufacturer about the product as provided in R.S. 9:2800.58.
C. The characteristic of the product that renders it unreasonably dangerous under R.S. 9:2800.55 must exist at the time the product left the control of its manufacturer. The characteristic of the product that renders it unreasonably dangerous under R.S. 9:2800.56 or 9:2800.57 must exist at the time the product left the control of its manufacturer or result from a reasonably anticipated alteration or modification of the product.
D. The claimant has the burden of proving the elements of Subsections A, B and C of this Section.
Plaintiffs' theory of the case was based on La.R.S. 9:2800.56 and 9:2800.57. On appeal, plaintiffs abandoned their claim under La. R.S. 9:2800.56 and confine their argument to their claims under 9:2800.57 which states the following:
A. A product is unreasonably dangerous because an adequate warning about the product has not been provided if, at the time the product left its manufacturer's control, the product possessed a characteristic that may cause damage and the manufacturer failed to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product.
B. A manufacturer is not required to provide an adequate warning about his product when:

*916 (1) The product is not dangerous to an extent beyond that which would be contemplated by the ordinary user or handler of the product, with the ordinary knowledge common to the community as to the product's characteristics; or
(2) The user or handler of the product already knows or reasonably should be expected to know of the characteristic of the product that may cause damage and the danger of such characteristic.
C. A manufacturer of a product who, after the product has left his control, acquires knowledge of a characteristic of the product that may cause damage and the danger of such characteristic, or who would have acquired such knowledge had he acted as a reasonably prudent manufacturer, is liable for damage caused by his subsequent failure to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product.
At the close of trial, interrogatories were submitted to the jury. The first interrogatory questioned as follows: "Do you find Jeep Corporation (Chrysler) at fault, which fault was a legal cause of Leslie Hataway's accident?" The jury answered "No." The form instructed the foreperson to date, sign and return the form if the answer to the above question was no. Thus, we have no idea why the jury reached the verdict it did.
On appeal, plaintiffs, citing two first circuit cases, Phipps v. Amtrak, 94-1876 (La. App. 1 Cir. 11/20/95), 666 So.2d 341, writ denied, 95-3012 (La. 2/28/96), 668 So.2d 368; and Green v. City of Thibodaux, 94-1000 (La.App. 1 Cir. 10/6/95), 671 So.2d 399; writ denied, 95-2706 (La. 2/28/96), 668 So.2d 366, argue that the question of whether or not a product is defective is a legal question and thus this court should conduct a de novo review of the record to determine if the Jeep CJ-7 was defective (i.e. unreasonably dangerous because of inadequate warning).
We reject plaintiffs' foregoing argument. We note the following: 1) A writ denial adds nothing to an appellate court decision; 2) In denying writs in both cases the Louisiana Supreme Court felt it was necessary to add "The result is correct." and "Result is correct." to the respective writ denials (emphasis added); and 3) In Hines v. Remington Arms Co., Inc., 94-0455 (La. 12/8/94), 648 So.2d 331, 335, the supreme court stated "Whether a product is unreasonably dangerous, and thereby is defective, is a question of fact to be made by the fact finder. Gilboy v. American Tobacco Co., 582 So.2d 1263 (La. 1991); Bloxom v. Bloxom, 512 So.2d 839 (La.1987)." Thus we will review this case under the manifest error standard of review.
In Rosell v. ESCO, 549 So.2d 840, 844-845 (La.1989) the court stated:
It is well settled that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of `manifest error' or unless it is `clearly wrong,' and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Arceneaux v. Domingue, 365 So.2d 1330, 1333 (La.1978); Canter v. Koehring, 283 So.2d 716, 724 (La.1973). See also, Sevier v. United States Fidelity & Guaranty Co., 497 So.2d 1380, 1383 (La.1986); West v. Bayou Vista Manor, Inc., 371 So.2d 1146, 1150 (La.1979); Davis v. Owen, 368 So.2d 1052, 1056 (La.1979); Cadiere v. West Gibson Products Co., 364 So.2d 998, 999 (La. 1978); A. Tate, `Manifest Error' Further observations on appellate review of facts in Louisiana civil cases, 22 La.L.Rev. 605, 611 (1962). The appellate review of fact is not completed by reading only so much of the record as will reveal a reasonable factual basis for the finding in the trial court, but if the trial court or jury findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Arceneaux, supra at 1333, Watson v. State Farm Fire & Casualty Ins. Co., 469 So.2d 967 (La.1985). In *917 applying the manifestly erroneousclearly wrong standard to the findings below, appellate courts must constantly have in mind that their initial review function is not to decide factual issues de novo. See, F. Maraist, The Work of the Louisiana Appellate Courts for the 1978-1979 TermA Faculty Symposium, Civil Procedure, 40 La.L.Rev. 761, 764 (1980); Comment, Appellate Review of Facts in Louisiana Civil Cases, 21 La.L.Rev. 402, 412 (1961); Cf. Anderson v. City of Bessemer City, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985); Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969).
When findings are based on determinations regarding the credibility of witnesses, the manifest errorclearly wrong standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Canter, supra at 724; Virgil v. American Guarantee & Liability Ins. Co., 507 So.2d 825, 826 (La.1987); Boulos v. Morrison, 503 So.2d 1, 3 (La.1987); Williams v. Keystone General Contractors, Inc., 488 So.2d 999, 1001 (La.1986); Johnson v. Insurance Co. of North America, 454 So.2d 1113, 1117 (La.1984); Berry v. Livingston Roofing Co., 403 So.2d 1247, 1249 (La.1981); Crump v. Hartford Accident & Indemnity Co., 367 So.2d 300, 301 (La.1979). Where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. See, Wilson v. Jacobs, 438 So.2d 1119 (La.App. 2d Cir. 1983), writ denied, 443 So.2d 586 (La.1983). Cf. State v. Mussall, 523 So.2d 1305 (La. 1988); Anderson v. City of Bessemer City, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985); U.S. v. U.S. Gypsum Co., 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948). But where such factors are not present, and a factfinder's finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong. See, Jackson v. Tate, 428 So.2d 882, 884 (La.App. 1st Cir.1983), citing McDonald v. Book, 215 So.2d 394 (La. App. 3d Cir.1968), overruled on other grounds, Celestine v. Hub City Motors, Inc., 327 So.2d 700 (La.App. 3d Cir.1976). Cf. Anderson, supra at 575, 105 S.Ct. at 1512; Schexnider v. McDermott International Inc., 868 F.2d 717, 720 (5th Cir. 1989); Employers Ins. of Wausau v. Suwannee River Spa Lines, Inc., 866 F.2d 752, 770 (5th Cir.1989); U.S. v. Hibernia National Bank, 841 F.2d 592, 595 (5th Cir.1988); Hanson v. Veterans Administration, 800 F.2d 1381, 1388 (5th Cir.1986). [footnote omitted].
The foregoing scope of appellate review was reaffirmed by the Louisiana Supreme Court in Ferrell v. Fireman's Fund Insurance Co., 94-1252 (La. 2/20/95), 650 So.2d 742.
In the case at bar, volumes of documents were produced during discovery and over 175 pieces of evidence were submitted at trial including various documents, drawings, charts, photographs, and video tapes. Additionally, each side presented four expert witnesses on the issue of the defects, if any, in the Jeep CJ-7.
Plaintiffs' experts included Dr. Leon Robertson, a statistician, who compiled and presented data collected by other people on the comparative rollover rates of Jeep CJ-5 and CJ-7 vehicles as opposed to other vehicles. Although using the same data, Dr. Robertson was able to produce various charts and graphs by expressing the information in different ways: events per 100,000 years use[1], events per 100,000 vehicles, events per 10,000 vehicles, events per 10,000 vehicles in use per year, etc. All these rates were correlated against the stability of different vehicles which was expressed as the static stability ratio or T/(2 × H), where T stands for the track width (the distance between the center *918 of the left and right tire) of the vehicle and H stands for the height of the vehicle's center of gravity. It was established that most vehicles on the road today had a T/(2 × H) ratio between 1.01 and 1.66. The nearer the vehicle's ratio was to 1.00, the less stable it was. Dr. Robertson gave the T/(2 × H) of the Jeep CJ-7 as 1.07.
Plaintiff next questioned Mr. John N. Noettl (Master of Science in Engineering), the owner of Vehicle Support Systems, an accident reconstruction and vehicle testing firm in Arizona. Mr. Noettl had been involved in "rollover" testing of Jeep CJ-5, Jeep CJ-7, and other vehicles as Director of Engineering Operations for a former employer, Dynamic Science. Those tests had been done at the request of the Insurance Institute for Highway Safety. Mr. Noettl explained that those tests had been done using mechanical throttle and steering controls. Noettl stated "Now, this is not like a real driver in that it doesn't get feedback and adjust for anything." This was allegedly done to get reproducible "runs" by eliminating human variances. Basically two maneuvers were done: the "J" turn and the obstacle avoidance maneuvers. No braking was done and speed was held as constant as possible. Mr. Noettl admitted that between 600 and 700 "runs" were filmed but only 8 resulted in rollovers. Of those 8, 7 involved CJ-5 vehicles. Over objection by the defense, Mr. Noettl was allowed to describe each rollover in detail. Mr. Noettl opined that even one rollover would have been too many. He stated that in his opinion, Mr. Hataway's CJ-7 rolled over "... because of the relationship of its center of gravity height and track width, and the later accelerations or lateral forces that it was experiencing at the time." He further stated that he felt the 6,940 pound trailer attached to the 4,000 pound Jeep at the time of the accident played no part in causing the rollover.
On cross examination, Mr. Noettl stated that Jeeps had excellent braking systems and that in the critical situation of hard cornering braking reduces any rollover tendency. He admitted that all the tests done at Dynamic Science were done without braking; that the tests were done in either first or second gear because the automatic controller was unable to maintain the desired speed in third gear; and that the steering input was 525 degrees. These conditions were able to produce lateral forces in the vehicle of between 0.73 and 0.77 G (where G stands for the acceleration due to gravity). Mr. Noettl confirmed that he received a letter from the Insurance Institute which instructed him to continue "testing" until he could reliably produce the desired rollovers. Finally, he stated that in his opinion, damage to Mr. Hataway's Jeep indicated that it sustained a driver's side rollover.
Dr. Waymon L. Johnston (Ph. D. in Industrial Engineering), a safety and human resources engineering consultant, was next called by plaintiffs. He stated that he found no stickers or decals on Jeep giving any warning regarding towing. Neither did he find any warnings about the vehicle having a narrow track, a high center of gravity, or any propensity to roll over. He stated his inspection of the 1978 Jeep owner's manual revealed only perfunctory instructions regarding towing: "When your vehicle is used for trailer towing ... never exceed the gross vehicle weight rating, GVWR, or gross axle weight rating, GAWR, by the addition of: The tongue weight of a trailer ..." The manual listed the GVWR of the Hataway vehicle as 4,150 pounds. According to Dr. Johnston, if one follows those perfunctory directions and adds the curb weight, 3,200 pounds, Mr. Hataway's weight, 200 pounds and the tongue weight of the trailer, 580 pounds, the sum comes to 4,000 pounds. This figure is below the vehicle's GVWR and looking only at that one calculation it would appear that it was permissible to tow the load Mr. Hataway was towing.
Dr. Johnston stated that the manual did contain a warning about never interconnecting the vehicle and trailer hydraulic brake systems and a statement advising the consumer to consult his Jeep dealer "[f]or more information about trailer towing ..." Dr. Johnson opined that, as a warning, the information provided by Jeep in the owner's manual was "completely inadequate." He further stated that, in his opinion, Jeep should have notified all previous purchasers of their vehicles *919 each time they changed any vehicle's towing recommendations.
Under questioning by the defense, Dr. Johnston stated that he had never taken any driver education courses, has never driven or towed a trailer with a Jeep and that all of his answers were based solely on documents provided to him by plaintiffs. When asked, he could not name any 1978 vehicle which had a sticker or decal giving instructions or recommendations concerning using the vehicle to tow a load. He admitted that the Jeep owner's manual gave better warnings and recommendations as the years progressed and that the improvement did not connote the prior manuals were defective. He further admitted that he did not think it was improper to refer someone to a different document for purposes of obtaining specialized information about a particular application and that 1978 CJ-7's did not offer trailer hitches as either standard or optional equipment. Finally, Dr. Johnston confirmed that he is the same Dr. Waynon Johnston who previously testified that the manufacture and sale of "muscle cars" was an unreasonable thing to do as those vehicles have no utility.
Plaintiffs' last expert Robert L. Anderson (Master of Science in Mechanical Engineering), an independent consultant who was accepted as an expert in accident reconstruction, was also a former employee of Dynamic Science. However, Mr. Anderson left Dynamic Science just as Mr. Noettl was coming into the company and before the Jeep tests were begun. When questioned about the accident at issue, Mr. Anderson described a passenger side rollover. He ruled out tripping, ramping, and the trailer as the cause of the rollover. In his opinion, the trailer imparted turning or yaw motion to the Jeep, but did not "push over" the vehicle. Mr. Anderson testified that, considering the facts of this case, it would only take about 1,380 pounds of force to cause the rear end of the Jeep to begin to yaw and, considering the weight of the loaded trailer, it would not take much sway to produce such a force. He further stated that, if anything, the tongue weight of the trailer helped to stabilize the Jeep. He opined that the 1978 CJ-7 was defective in design because of the ease with which it could be made to roll over. Mr. Anderson knew of no stability testing done by Jeep on any pre-1980 CJ models.
On cross examination by Jeep, Mr. Anderson stated that he had never designed a vehicle for production, nor had he ever been involved with a manufacturer in the process of bringing out a new vehicle. He agreed with the defense that the basic cause of the rollover was the Jeep sliding down the highway, sideways, in excess of 20 m.p.h.; that the trailer pushed the Jeep around and set it up to rollover; and that the trailer weighed 3½ tons, had no brakes and could only be controlled by forces exerted through the ball and hitch. He also agreed that the trailer did not stop pushing on the Jeep until the two separated. Mr. Anderson said a trailer may swing from side to side or "fishtail" because of, among other things, light tongue weight, improperly loaded (unbalanced) trailer, or shift in the load. In order to control fishtailing he recommended applying the trailer brakes (if the trailer was so equipped) or "driving through" the problem. In so far as the accident was concerned, he stated that when the fishtailing motion of the trailer got too great for the tires of the Jeep to control, the vehicle started to yaw counterclockwise. This caused the Jeep to begin to slow down. From the physical evidence (the yaw mark on the roadway, the final resting place of the Jeep, the damage to the Jeep, etc.), he believed the Jeep was traveling in the low 20 m.p.h. range when its tires lost contact with the roadway.
The defense then questioned Mr. Anderson regarding the safety of the 1978 Jeep CJ-7. He stated that he would not recommend pulling any trailer with a CJ-7. As to the incident in question, he testified that Mr. Hataway was exceeding Jeep recommendations on towing by pulling the trailer he was pulling with the hitch he was using. He also testified that Mr. Hataway was exceeding, by a factor of two, the recommended weight limit of the ball and, by a ton, the recommended weight limit of the hitch he was using. When specifically asked, plaintiffs' expert admitted that even a full-sized pickup truck could be made to turn over by a 7,000 pound trailer. Further, Mr. Anderson admitted *920 that as of 1996 there are no governmental standards, or generally accepted discriminating tests of rollover stability, and that the 1978 CJ-7 met all applicable Federal Motor Vehicle Safety Standards. He also admitted that in 1980, the National Highway Traffic Safety Administration (NHTSA) received a complaint about the propensity of Jeeps to roll over. NHTSA investigated that complaint and concluded that the complaint involved situations in which drivers had exceeded the limits of the vehicles. In its report on the matter NHTSA stated: "In summary our findings do not indicate the presence of a potential safety defect in the design or manufacture of the CJ type vehicle, stability or the Jeep approved roll bar integrity.... Thus we have determined that there is no reasonable possibility that an order concerning the notification and remedy of a defect in these vehicles would be issued at the conclusion of an investigation."
At this point, plaintiffs presented testimony and evidence on damages and then rested their case. Two facts elicited during that testimony merit inclusion here: first, to the best of the witnesses' knowledge, Mr. Hataway had not towed anything with the Jeep prior to the day of the accident; and second, no one could recall Mr. Hataway ever reading the Jeep's owner's manual.
Defendants' first witness was Mr. James Thornton (Master of Science in Automotive Engineering), who is one of three owners of Applied Technology, an engineering design company in Ohio. Mr. Thornton, a former employee of Jeep/American Motors/Chrysler, professed to be a "car nut." His past experiences included designing, building, and racing automobiles and snowmobiles. Although the CJ-7 project had begun before Mr. Thornton went to work for Jeep, it was clear from his testimony that Mr. Thornton considers the CJ-7 project to have been his. He explained that the CJ-7 was designed to be a true "utility" vehicle. He stated that it was purposely designed with a narrow track and with high ground clearance to increase the vehicle's maneuverability and its ability to surmount off road obstacles. He showed and narrated a film which demonstrated the CJ successfully negotiating obstacles a Blazer and motorcycles could not.
Mr. Thornton then explained the steps in the development and testing of the CJ-7. One of the ongoing steps, he explained, was defining the "performance envelope" or the "envelope" as it is commonly called. This consists of taking the vehicle out to test sites and determining its maximum capabilities. This is done by "pushing the envelope" or coming close to loosing control or crashing without actually doing so. Mr. Thornton was obviously proud to have been the driver in some of these tests. Mr. Thornton stated that there is no clear line between what is within and what is beyond a vehicle's capability. He also stated that "[t]he only one [line] that I know is what the plaintiffs' experts draw and they draw it just a little bit higher than the vehicle they're testifying about." He said that according to NHTSA there is no way to draw such a line. Mr. Thornton was particularly bitter about the Dynamic Science tests, stating that the purpose of those tests was to take vehicles out and roll them over for the camera to capture.
According to Mr. Thornton the development of new vehicles is an ongoing process which is fueled by changing consumer demands and preferences. He stated that work had just finished on the CJ-7 when the CJ-2 project started. Because of the lead time between the beginning of a project and its market debut, he stated that interim steps are commonly taken in an attempt to temporarily satisfy consumer demands. That is why, he explained, the track on the CJ-7 was widened 4 inches in 1982. According to Mr. Thornton consumer desires were shifting toward a vehicle which rode and which was equipped more like a car than a truck, but which still retained Jeep's off-road ability. The CJ-2 project lead to the introduction of the Wrangler, a more mild-mannered Jeep vehicle.
Mr. Thornton was also questioned about internal Jeep documents which used such terms as "risks" and/or "deficiency/deficiencies." He explained that the terms "risk" or "risks" were commonly used to refer to marketing or sales, i.e. "What is the risk that the consumer will not like or buy this model?" *921 "Deficiency" and/or "deficiencies," he explained, were used in engineering to describe attributes of a product which did not live up to expectations and which needed improvement. The terms did not relate to product defects or physical risks to the consumers who use the product. As to allegations that Jeep held back documents from government investigators, Mr. Thornton referred to a letter from NHTSA which states in part, "Chrysler supplied ... every document that has ever been produced in any kind of law suit, or any document that has to do with the handling of Jeep vehicles, or anything that might be considered a safety issue."
Specific to this accident, Mr. Thornton referred to the 1978 Jeep brochure which gave detailed recommendations on towing. The brochure shows that for anything greater than a 2,000 pound Class I trailer, an equalizing hitch, power brakes, an extra-duty cooling system, a heavy duty alternator, a 70 amp./hour battery, a 4.09:1 ratio rear end, and an optional V-8 engine are required. The brochure further states that towing of Class III trailers (those with dual wheels and weighing 5,000 pounds or more) with any CJ model is not recommended and that for towing of trailers in excess of 1,000 pounds a separate trailer braking system is recommended. Mr. Thornton explained that the change in towing recommendation for CJ vehicles in later (than 1978) models was not due to any untoward experience, but rather was due to changes in available optional equipment (mainly engines and rear end ratios) which were prompted by the new federal mileage and emission standards.
On cross examination, Mr. Thornton admitted that he was being paid by Chrysler to testify and that he had testified in other cases involving Jeep accidents. He further admitted that the authors of some of the internal documents obtained by plaintiffs during discovery were prepared by individuals who held positions above his in the company hierarchy.
For reasons of continuity, we will now discuss the testimony of defendants' last witness, Mr. Lee Carr (Master of Science in Mechanical Engineering), owner of Carr Engineering, Inc. in Houston. Carr Engineering investigates and reconstructs crashes, and tests vehicles to determine their maximum performance limits. Mr. Carr formerly worked for Ford Motor Company designing steering and suspension systems. In graduate school he designed a mathematical model to evaluate and predict how a car would perform "... at or near the limits of stability, at or near the limits of tire traction, [and] what would happen under the worst possible cases ..." Mr. Carr was offered and accepted as an expert in automotive engineering, vehicle dynamics, and rollover causation and analysis.
Mr. Carr stated that it is a fact that vehicles will roll over; this is not something particular to Jeeps. He went on to state that in each of the last four years there have been approximately 2 million crashes involving injury and, of those 2 million, about 220,000 to 250,000 of those involved rollovers. Of the rollover accidents, Mr. Carr said statistics show about 2/3's of rollovers involved passenger cars and the other 1/3 involved trucks, vans and utility vehicles. Generally, over 50% of rollover crashes involved drivers who were impaired by alcohol and/or drugs. Other causes include adverse environment (wet or icy road, going off the roadway, etc.) and/or speeding.
NHTSA statistics show that, generally, two groups or classes of vehicles have the highest involvement in rollover accidents: 1) pickup trucks and utility vehicles; and 2) sports cars. Mr. Carr noted that these two classes of vehicles possess markedly different T/(2 × H) ratios, with sports cars having the highest ratios of all vehicles. He explained that the T/(2 × H) ratio is only a measure of the static or "at rest" propensity of a body to turn over. Mr. Carr admitted that the Jeep CJ-7 has a higher rollover rate than most passenger cars, but stated that compared to pickup trucks it wasn't so bad.
Concerning the Dynamic Science tests, Mr. Carr pointed out that in 436 runs with the CJ-5, in the single directional steer (i.e. the "J" turn maneuver) event there were only 3 rollovers. Mr. Carr noted that any vehicle can be made to roll over if one sets out to do so. He referenced studies done by the University of Michigan in which a Mercedes *922 Benz 300 SEL, a V-W Beetle, a Toyota Corolla, and a Dodge Coronet were all rolled at speed in the mid 30 m.p.h. range. Mr. Carr stated that he had personally, purposely rolled a Blazer, a Bronco, a Corolla, and a Nissan pickup truck.
As far as the CJ-7 was concerned, Mr. Carr testified that he had personally done a number of "bootlegger" turns (where one heads in one direction, gets up significant speed, and then applies braking and steering resulting in the vehicle heading in the opposite direction) with the CJ-7 without rolling the vehicle. A video tape of these tests was introduced and played for the jury. Following the tape, Mr. Carr went on to explain the Calspan tests which measured drivers' responses to sudden emergency situations. He related that those tests showed that most drivers will use only the brakes when confronted with an emergency. Of the drivers who used steering when confronted with sudden emergencies, men usually turned the wheel not more than 180 degrees, and women, not more than 120 degrees. He concluded that the Calspan tests cast serious doubt on the validity of the Dynamic Science tests which used no braking, attempted to keep speed constant, and which applied 525 degrees of steering in its tests. Mr. Carr remarked that Dynamic Science "... had to take special steps, they had to go out of their way to find ways to make it [a Jeep] roll over at that kind of speed [the 20-30 m.p.h. range]."
Finally, when questioned about Mr. Hataway's accident, Mr. Carr answered as follows: "Well, first you don't stand the risk of a rollover until you got the thing out of control. The first element is ... loss of control. Now, what's happened here is that you take a trailer that weighs almost 7,000 pounds and you take this Jeep, which I weighed ... one like it ... to be just in excess of 3,400 pounds with nobody in it. You take that combination, you got a vehicle that's about 10,000 pounds, more than 10,000 pounds in weight and you're trying to control that with the tires and equipment on a Jeep CJ-7 that weights 3,400 pounds all by itself. What that does is, it takes away the margin, it eats up the margin, it diminishes the margin of stability the vehicle already has by putting the extra weight in it. What's happened is, that weight is what's pushed it to get it out of control and once you get it going sideways, coming along the pavement being pushed by a 7,000 pound trailer, it's going to roll over."
At this point, Mr. Carr showed and explained a video tape of him pulling the Brunson trailer, which he purchased from Mr. Brunson, with a 1978 CJ-7. In this demonstration the gross weight of the trailer was only 3,500 pounds, half of the load Mr. Hataway was pulling, and, before the demonstration, Mr. Carr had equipped the trailer with brakes.
On cross examination, the plaintiffs' case took two main thrusts: the 1978 Jeep owner's manual did not specifically say not to tow a 7,000 pound trailer; and Dr. Robertson's figures and graphs show the Jeep to be much more dangerous when compared to automobiles as a whole.
On rebuttal, Dr. Carr stated that, in his opinion, the 1978 Jeep CJ-7 was a reasonably safe and appropriate vehicle, for its intended use, which met all applicable federal motor vehicle safety standards at the time.
Dr. Dennis Gunther (Ph.D. in Mechanical Engineering), an associate professor of mechanical engineering at Ohio State University and a project engineer at SEA, Inc., a fire investigation and engineering company, was called after Mr. James Thornton as the defendants' next witness. Dr. Gunther was offered and accepted as an expert in accident reconstruction. Dr. Gunther was apparently the first accident reconstruction expert to recognize that Mr. Hataway's Jeep sustained a passenger side rollover. After his conclusion was made known, those who had different opinions changed their minds and accepted Dr. Gunther's conclusion. Dr. Gunther's and Mr. Anderson's testimony agree except as to the cause of the rollover. While Mr. Anderson maintains defective design was the culprit, Dr. Gunther presents a different explanation. Dr. Gunther's explanation starts a little further up the road, before the accident. First, he notes that no evidence was preserved which showed exactly where Mr. Hataway ran off the roadway and onto the *923 shoulder. Therefore, he was unable to calculate the Jeep's speed when this event occurred. However, by using the photographs of the accident, matching the cracks displayed in those photographs to the cracks in the actual roadway, and then measuring the various feature on the road surface, he was able to estimate that the Jeep was traveling at approximately 30 m.p.h. as it regained the roadway. Using the same yaw mark (which all agree was left by Mr. Hataway's right front tire) used by Mr. Anderson and the final resting place of the Jeep, Dr. Gunther estimated the speed of the Jeep when it began its roll at about 25 m.p.h. He noted that the end of the yaw mark (the place the roll began) was 94 inches from the edge of the roadway. That distance exactly matches the wheel base of the CJ-7 so, Dr. Gunther concluded, the right rear tire contacted the roadway just as the roll began. This was verified by a mark in the edge of the asphalt and scrape marks on the Jeep's right rear wheel rim. Dr. Gunther noted that the only thing that could resist the sliding inertia of the Jeep-trailer combination was the tires on the Jeep as the trailer had no brakes and its momentum was forward or down the highway. As the Jeep started across the highway, Dr. Gunther explained, centripetal force propelled it sideways down the highway. He likened that force to the force a driver feels pushing him into his car door as he makes a hard right turn. Such a maneuver produces a force called pitch which tends to rotate the vehicle vertically around its long axis (i.e. the vehicle tends to roll over on its side). Dr. Gunther concluded that the force exerted on the Jeep by the trailer's 7,000 pounds when combined with the forces already at play from the hard left turn caused the vehicle to roll. He explained that the trailer arm acted as a long lever or "moment arm" and referred to Archimedes' observation "Give me a moment arm big enough and you can lift the world." Accordingly, he explained that even though the force was applied below the Jeep's center of gravity, it did not stabilize the Jeep, but rather flipped it over. At the end of his direct testimony Dr. Gunther was asked, "In your opinion, was the fact that this vehicle rolled over in this accident due to some unique characteristic of the vehicle?" He answered. "Not at all." He was then asked, "What was it due to?" and responded, "6,940 pounds of inertia at about 25 to 30 miles an hour pushing through the bulldog coupler into the back of a 2 inch ball on the hitch of a 1978 CJ-7."
Defendants' next witness was Dr. Alan Dorris (Ph.D. in Industrial Engineering), who owns Dorris and Associates, an Atlanta consulting firm. Dr. Dorris was offered and accepted as an expert in product engineering and warnings. Dr. Dorris first noted that there have been studies on the effectiveness of warnings. Those studies included such factors as the gravity of the danger, the severity of consequences if the warning is ignored, and how the warning is presented. Additionally, the studies generally showed that how a warning is presented made little difference in compliance rates. Dr. Dorris stated that he examined the 1978 Jeep owner's manual and found it to be reasonable and appropriate, including the portion which advised the consumer to contact the dealer for more information on towing. According to Dr. Dorris, an owner's manual should only contain information about the product which would be of interest to all buyers, as the bigger a manual becomes, the less likely a consumer is to read it. If certain information applies only to some users, it is entirely appropriate for a manual to refer the consumer who needs or desires that information to a supplemental source. Dr. Dorris also noted that the fact that a manual changes, to include information previously available only from a supplemental source, does not indicate that the earlier manual was, in any way, deficient; as a product evolves so does the manual which accompanies it.
When asked to comment on Mr. Brunson's warning versus anything which could have been included in the owner's manual, Dr. Dorris stated, "I don't think that there's anything that the manufacturer of the product could have done that would be as direct as a person to person communication from a longtime friend who is familiar with the product and who has concern about you."
During cross examination the plaintiffs went over the information which was contained in the owner's manual and the GVWR *924 calculations done by Dr. Johnston. Witnesses agreed that according to Dr. Johnston's calculations Mr. Hataway was within the recommended GVWR limit. As to placing labels on dashboards, Dr. Dorris stated that most consumers don't appreciate labels being stuck all over their new $20,000.00 vehicle. Plaintiff also suggested that all manufacturers should build the safest product possible. Dr. Dorris replied that if that was true then there would be no choice of different models of cars or airplanes, etc. He explained: "Some of us want a smaller, more fuel efficient vehicle because it's easier to park and we get better gas mileage; but we know that if we run into something else, we may not be as well off as if we had that, that [sic] bigger vehicle."
Dr. Dorris was shown a Jeep newsletter which showed one Jeep towing an 8,000 pound "Mobey Shad" and another towing a house-moving truck with house attached. He dismissed such items as advertisement and "puffing," not approval or recommendations by Jeep that such activities were sanctioned. When asked if he had ever found an instruction or a warning in a Jeep manual inadequate, Dr. Dorris replied: "No. As far as I can tell, what Jeep has provided over the years has been adequate."
In sum, at trial, plaintiffs argued that the 1978 Jeep was defective in design and/or for failure to warn. They maintained it was the defective Jeep which caused the accident on La. Hwy. 8, on December 2, 1989, which in turn resulted in Mr. Hataway's death. Plaintiffs presented four expert witnesses in an attempt to prove their case. On the other hand, the defense maintained that it was Mr. Hataway's ignoring of warnings and recommendations which were available to him at that time and for the preceding 11 years that resulted in the accident and his death. No one knows why the trailer initially started to fishtail, although several theories were presented: an incorrectly loaded trailer; incorrect tire pressure(s); the broken board on the trailer floor caused a shift in the load; excessive speed for the prevailing conditions; simple inattention; or a combination of any two or more of those factors.
On appeal, plaintiffs argue that the tests done by Dynamic Science and others put Jeep on notice that its 1978 CJ-7 had a stability problem and that Jeep had a duty to warn all prior purchasers of that problem. They also argue that the 1978 owner's manual was defective in that it did not contain full towing information regarding the CJ-7. They further argue that as the towing recommendations changed for the later models of the CJ-7, that information should also have been forwarded to all prior CJ purchasers.
The defendants presented testimony and evidence that in 1978 the Jeep CJ-7 met all applicable federal safety standards, and that, in the early 1980's, NHTSA, after receiving and investigating allegations of Jeep instability, concluded that there was no substance to the complaint. Jeep's own engineers and designers tested the vehicle to the point of "pushing its envelope" and found no defects. As to warnings, Jeep's reliance on the proposition of no defect, no duty to warn, appears to be reasonable. The changes in the owner's manuals were explained as changes in available equipment and in mechanical specifications due to changing federal standards. Changes in design were explained as attempts to improve the product and to respond to changing consumer preferences and desires.
We have scrupulously examined the evidence and have meticulously read the testimony presented to the jury over 8 days of trial. After completing this arduous task, we cannot say that the conclusion reached by the jury is clearly wrong. Accordingly, for the reasons stated, the judgment of the trial court is affirmed. All costs of this appeal are assessed against appellants.
AFFIRMED.
PETERS, J., dissents and assigns written reasons.
PETERS, Judge, dissenting.
I respectfully dissent from the majority opinion. My review of the record causes me to conclude that the jury was manifestly wrong in finding that the defendant was without legal fault in causing Mr. Hataway's death.
*925 As stated by the majority, the plaintiffs argue that the Jeep CJ-7 design is unreasonably dangerous because of lack of warnings associated with the vehicle's rollover propensity and because of specific inaccuracies in the owner's manuel instructions concerning towing. Based on my review of the record, I would reverse, finding that Jeep had a duty to warn owners of the CJ-7's rollover propensities or characteristics as they became known to Jeep after the vehicle left its control.
Under the Louisiana Products Liability Act, a product may be unreasonably dangerous because of an inadequate warning. La. R.S. 9:2800.54(B)(3) and 2800.57(A).
What constitutes an adequate warning is also defined by statute.
The following terms have the following meanings for the purpose of this Chapter:
. . . .
(9) "Adequate warning" means a warning or instruction that would lead an ordinary reasonable user or handler of a product to contemplate the danger in using or handling the product and either to decline to use or handle the product or, if possible, to use or handle the product in such a manner as to avoid the damage for which the claim is made.
La.R.S. 9:2800.53(9).
As indicated by the majority, little guidance can be gleaned from the jury verdict. The trial lasted eight days and consisted primarily of the presentation of expert testimony and over 175 items of evidence, most of which are technical exhibits. The jury then deliberated less than a full day in reaching its conclusion. Such lack of guidance to this court makes a manifest error review all the more difficult. When the trier of fact's reasons are not clear as to the theory of facts relied upon to reach a conclusion, we are not able to give the usual deference attributable to fact finder decisions. Bloxom v. Bloxom, 512 So.2d 839 (La.1987). This decision suggests that a de novo review might be appropriate in such a situation. However, even reviewing the jury's verdict under the manifest error standard, I find that the jury was clearly wrong in failing to find fault on the part of Chrysler Corporation.
A case such as this is reviewed pursuant to a duty-risk analysis.
In determining whether liability exists under a duty-risk analysis, a plaintiff must prove that the conduct in question was the cause-in-fact of the resulting harm, that defendant owed a duty to plaintiff which defendant breached and that the risk of harm was within the scope of protection afforded by the duty breached.
Campbell v. Louisiana Dep't of Transp. & Dev., 94-1052 (La. 1/17/95), 648 So.2d 898, 901.
Applying this analysis, I would conclude that Chrysler was at fault in causing this accident. The majority compares the testimony of the experts and concludes that the jury was not clearly wrong in reaching the conclusion it did. I have reviewed the same testimony and exhibits and conclude otherwise.
W.C. McBride observed the Hataway vehicle veer to the right as a result of the trailer fishtailing. He saw the right tires leave the roadway and the Jeep begin to veer back to the left. The next thing he remembered seeing was the undercarriage of the Jeep. Both plaintiffs' expert and defendant's expert agree that the Jeep began to yaw counterclockwise after regaining the roadway; began a passenger side roll after turning perpendicular to the highway; rolled over 360 degrees; and came to a rest partially straddling the midline of the highway almost facing the direction from which it was coming. During the rollover, Mr. Hataway was ejected. The opinion of Dr. Waymon C. Johnston that the rollover caused Mr. Hataway's death is not seriously disputed.
Long before the accident, the manufacturers of the Jeep line of vehicles became aware of the rollover propensities of the Jeep CJ line, including the CJ-5 and CJ-7.[1] Numerous studies and technical papers which document *926 this propensity, beginning with the history of its military counterpart, are a part of the record. These include studies for or by the University of Michigan Highway Safety Research Institute, the Insurance Institute for Highway Safety, the Highway Safety Research Center of the University of North Carolina, the National Center for Statistics and Analysis, the National Highway Traffic Safety Administration, and the SAE Technical Paper Series, to name a few. All of these studies reached basically the same conclusionthat among the various factors associated with accidents, the strongest predictor of vehicle rollover is the static stability factor or ratio. Many of these reports involved specific studies of the Jeep CJ series, and all of those which did expressed concern over the rollover rate of those vehicles.
Dr. Robertson based many of his statistical conclusions on a 1981-82 study from the files of the Fatal Accident Reporting System (FARS). In that study, FARS concluded that there was an increased rollover probability for vehicles with static stability ratios less than 1.2. Three of the fifteen vehicles in the study had static stability ratios of less than 1.2. Those were the Jeep CJ-5 (1.01), the Jeep CJ-7 (1.07), and the pre 1978 Ford Bronco (1.1). A study of actual accidents revealed that these three particular vehicles are involved in a disproportionate number of rollover fatalities. The charts prepared from this data reflect a rapidly descending function of the static stability ratio from a value of 1.01 to 1.3, with no trend at higher values. The CJ-5 was twelve times more likely to be involved in a rollover fatality than the combined car rate and the CJ-7 and pre-1978 Ford Bronco were seven times more likely.
In February of 1980, a technical report was published by the University of Michigan Highway Safety Research Institute, which had as its purpose "to investigate the on-road crash experience, safety, and stability of utility vehicles." This report concluded:
[U]tility vehicles experience a rollover rate 5 to 11½ times higher than passenger cars; the JEEP and pre-1978 Bronco overturn at least twice as often as Blazer; rollover and ejection in open cab vehicles appear to be major fatal injury factors; death and injury rates ... are about twice as high in JEEPS as in Blazers.
The study findings raise serious questions concerning the safety and stability of these vehicles....
(Emphasis added).
Part of the data used in this report was derived from the military records which established that of the 1,022 accidents between July 1974 and July 1976 involving the Army M151 Jeep, sixty-six percent involved rollovers. The M151 Jeep is the military forerunner of the CJ series.
This same report also found that in accidents reported in Michigan in 1976, 12.7 percent of those involving utility vehicles resulted in rollovers as compared to 3.5 percent for sports cars and 1.7 percent for all vehicles combined. The Michigan study also emphasized the importance of the static stability ratio in predicting rollover propensity.
A report prepared jointly by the Highway Safety Research Center of the University of North Carolina and the Insurance Institute for Highway Safety was released in September of 1981 and had as its stated purpose:
[T]o examine in detail the crash experience of leading utility models to determine the extent to which there are variations in their crash experience and whether specific models appear to have particular problems.
This report studied accidents in North Carolina and Maryland, and concluded that utility models had four to five times higher rollover rates than pickups or passenger cars. In the report's introduction, the history of the Army Jeep rollover propensity was also discussed. A follow-up report prepared by the Highway Safety Research Center of the University of North Carolina, released in August of 1984, basically reached the same conclusions. Additionally, in February of 1982, the National Center for Statistics and Analysis, Mathematical Analysis Division, released a report concerning the CJ-5, which concluded that the vehicle was more likely to rollover than any other vehicle and that occupant fatality in rollover accidents involving the vehicle occurred more frequently than in other vehicles.
*927 A United States Department of Transportation National Highway Traffic Safety Administration report, prepared for the Research and Development Office of Crash Avoidance Research and released in August of 1989, studied accidents occurring in Texas, Maryland, and Washington. This report concluded that vehicle stability factors and location of an accident (urban or rural) were important predictors of rollover probability. The study concluded that vehicles with high centers of gravity and narrow track widths were involved in a disproportionate number of rollovers in single-vehicle accidents.
In February and March of 1990, the Internal Congress and Exposition in Detroit, Michigan, was presented with a technical paper which concluded that, among variables, stability factors were the strongest predictor of vehicle rollover. The report suggested that changing this variable could reduce rollover frequency as much as sixty percent.
In rebuttal of these critical studies, the manufacturer presented the testimony of James Thornton, who claimed personal responsibility for the CJ-7 design. He suggested that the various studies constituted a "smear" campaign by the Insurance Institute for Highway Safety and that the "testing" upon which the plaintiffs rely was faulty. However, while criticizing the testing performed by other agencies, he did not address the actual accident statistics relied upon by the plaintiffs, which document the high rollover frequency of the CJ-7 compared to other automobiles, including other utility vehicles.
Even Jeep's interoffice correspondence lends credibility to the plaintiffs' allegations. The record contains numerous documents originating from Jeep personnel, which address the same concerns as the independent studies. Principally, these documents suggest that the CJ-7 should be modified by increasing the track width or lowering the center of gravity to increase the static stability ratiothe same suggestion as presented by the independent studies. In fact, the very first design characteristic change recommended for the replacement vehicle for the CJ-5 and CJ-7 series involves the "DEFICIENCIES" of "HANDLING, STABILITY," and "ROLLOVER CHARACTERISTICS." Mr. Thornton would ignore such internal documentation by suggesting that such terms as "risks" and/or "deficiency/deficiencies" have different meanings when used within the company. I do not accept such an explanation. It is not reasonable to suggest that technical personnel outside the company speak a different language than those inside the company.
It is interesting to note that the record also contains a report from the Calspan Advanced Technology Center, prepared for the vice president and general counsel of the American Motors Corporation Legal Department and dated July 1989, which reached the general conclusion that the Jeep CJ vehicle is not susceptible to rollover, but that in speed ranges of twenty-two to thirty-five miles per hour, it was possible to achieve rollover or tipping consistently.
Although we review findings of fact under the manifest error standard,
[w]here documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination.
Rosell v. ESCO, 549 So.2d 840, 844-45 (La. 1989).
In my opinion, a reasonable fact finder would only conclude that the Jeep CJ-7 suffered a disproportionate number of rollover fatalities due to the low static stability ratio, that this propensity rendered it unreasonably dangerous without a warning of such propensity, and that the manufacturer was aware of the propensity but chose not to issue any warning "that would lead an ordinary reasonable user ... of a product to contemplate the danger" associated with its use. La.R.S. 9:2800.53(9).
One of the fundamental principles of safety engineering is to anticipate every possible type of accident which may occur because of machine failure or human failure and then to establish safeguards to minimize *928 the hazards or injury which may result when such a failure occurs.
K.A. Stonex, Roadside Design for Safety, TRAFFIC SAFETY RES.REV., December, 1961, at 18, 19 (italics omitted).[2]
Jeep chose to ignore this fundamental principle in that it failed to minimize the injury potential by failing to warn the vehicle owners of the potentially fatal rollover propensity. Thus, I would find that Chrysler owed a duty to Mr. Hataway which it breached and that the risk of harm to Mr. Hataway was within the scope of protection afforded to him. The remaining question is whether this conduct was a cause-in-fact of the injury sustained. All of the experts agree that the trailer imparted turning or yaw motion to the Jeep and that when it rolled over, it was traveling sideways at a speed of between twenty and thirty miles per hour. The plaintiffs' experts concluded that the trailer did not "push over" the vehicle but that when it turned perpendicular to the highway, the speed and rollover propensity caused it to do a passenger side roll. The defendant's experts seem to suggest that the trailer continued to push the Jeep such that it rolled over. However, all agree that the coupler connecting the Jeep and the trailer was located below the center of gravity of the Jeep. One would expect the front of the Jeep, rather than the driver's side, to be lifted up, given the downward pressure being exerted on the coupler.
In my opinion, the evidence clearly establishes that the trailer imparted the initial movement of the Jeep but that thereafter the combination of speed and low static stability ratio caused it to roll. Therefore, I conclude that the failure to warn Mr. Hataway was a cause-in-fact of the accident.
The remaining part of the review is not difficult. As the majority points out, we do not know why the vehicle initially fishtailed. Regardless of how the accident was initiated, it is clear that Mr. Hataway was negligent and that his negligence was a substantial cause of the accident. As the driver of the Jeep, he had a duty to use reasonable care in the operation of his vehicle. He breached that duty, which encompassed the risk that he might be injured in the accident.
Based on my determination that both Chrysler and Hataway were at fault, I would next apply our comparative fault system in allocating the percentage attributable to each party. Analyzing the fault of the parties in causing the harm to Mr. Hataway, it is clear that the greater fault lies with Chrysler. See Campbell, 648 So.2d 898. It is clear that Mr. Hataway's negligence set the accident in motion, but the rollover defect in the Jeep was the principal cause of Mr. Hataway's death. With any vehicle having a higher static stability ratio, it is more probable that it would have skidded to a stop rather than rolled over. Therefore, I would fix the fault of Hataway at twenty-five percent and Chrysler at seventy-five percent. Based upon that allocation of fault, I would then consider damages.
NOTES
[1] i.e. the number of vehicles in use times the number of years the vehicles were on the road; Example10,000 DeSotos times 10 years on the road.
[1] The primary difference between the CJ-5 and the CJ-7 is that the latter has a wheel base which is ten inches longer than the former. This difference plays no part in the calculation of the static stability ratio, which as pointed out in the majority opinion, is a function of the track width and the height of the center of gravity.
[2] This article is found in the record as Plaintiffs' Exhibit 21/Defendant's Exhibit 9.